No. 65,921

ANN MARIE TAMPLIN, THOMAS TAMPLIN, and SUSAN TAMPLIN, *Appellees*, v. STAR LUMBER & SUPPLY COMPANY, *Appellant*.

(836 P.2d 1102)

Opinion filed July 10, 1992.

*Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, argued the cause, and *Jay F. Fowler* and *Susan H. Tilton*, of the same firm, were with him on the briefs for appellant.

*Randall E. Fisher*, of Michaud, Hutton & Bradshaw, of Wichita, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a personal injury action. Plaintiff, Ann Marie Tamplin, a minor, was awarded $723,150.81 in damages based on the negligence of the defendant, Star Lumber & Supply Company (Star Lumber). The Court of Appeals affirmed. See *Tamplin v. Star Lumber & Supply Co.*, 16 Kan. App. 2d 352, 824 P.2d 219 (1991). We granted Star Lumber's petition for review.

Six-year-old Ann Marie Tamplin was injured on November 5, 1987, at Star Lumber in Wichita. Ann had accompanied her parents, Thomas and Susan Tamplin, on a shopping trip to Star Lumber to look at Formica. While there, a roll of vinyl flooring approximately six feet long and weighing about 150 pounds fell over, striking Ann on the head and knocking her to the cement floor. Star Lumber stored its rolls of vinyl flooring by standing them on one end against a wall.

Ann was unconscious or semiconscious and was bleeding from her mouth, nose, and ears. When her mother picked her up, she began vomiting blood. An ambulance was called and Ann was taken to St. Francis Regional Medical Center.

Ann was treated by Dr. Charles Shield at the St. Francis emergency room. Ann was considered to be in a life-threatening condition when she was admitted. Ann was later found to have: (1) a frontal skull fracture; (2) a temporal skull fracture; (3) a basilar skull fracture; (4) a nondisplaced fracture of the zygomatic arch (the high cheekbone beneath the eye); and (5) a tympanic membrane perforation in the right ear.

Ann was admitted to the hospital and placed in pediatric intensive care, where she remained for two days. Ann spent a total of nine days in the hospital. Ann stayed home for two weeks after her release and missed three weeks of school.

About one week after her release, Ann's parents noticed that she was drinking a lot of water and going to the bathroom frequently. Dr. Manfred Menking, a pediatric endocrinologist, performed a water deprivation test and determined that Ann had developed diabetes insipidus as a result of the trauma to the head. Diabetes insipidus is a different disease from the more commonly known diabetes mellitus, which is treated with insulin. Diabetes insipidus is a condition in which the pituitary gland, located at the base of the brain, does not secrete an antidiuretic hormone, vasopressin, which is responsible for permitting the kidneys to retain proper amounts of water. Without the hormone, excessive water is lost through the urine and the person is subject to electrolyte imbalances and, potentially, to life-threatening dehydration.

In Ann's case, her condition is permanent. Ann's deficiency makes her dependent for the rest of her life on a vasopressin

preparation known as DDAVP. Ann takes DDAVP twice a day. DDAVP is a liquid medication administered intranasally. Ann places the medicine in a tube and inhales it through her nose, or her parents assist her by blowing the medicine up her nose.

As long as Ann's medicine is regulated properly, she is a relatively normal child who is a good student, active in sports and Brownies, and well liked by other children. .

Ann's mother testified that periodically the dosage of DDAVP has to be adjusted because of Ann's weight and her individual need. Some nights Ann sleeps well and some nights she gets up as often as seven times to get a drink of water or to use the bathroom. This affects Ann the next day. She does not eat as well as she should, and her energy level may not be the same as that of other children. Often she will sleep after school, while the other children are out playing, to make up for the sleep she missed the night before.

Ann's father testified that the DDAVP product label states that DDAVP must be kept refrigerated once opened. As a result, the Tamplins have to make arrangements on trips to keep the medicine refrigerated. However, Star Lumber's expert testified that, in spite of the label, DDAVP may be kept at room temperature for up to three weeks.

In June 1990, the Tamplins took Ann to Dr. Craig Greenburg, an endocrinologist in Portland, Oregon. Dr. Greenburg testified that the primary purpose in his examination and tests was to assess which areas of the pituitary gland were deficient and which areas would likely become deficient in the future.

Dr. Greenburg was asked by plaintiff's counsel whether it is a *possibility* that there will be a problem as she grows and matures. Star Lumber did not object. Dr. Greenburg responded, in part:

"In her case, the pituitary did appropriately stimulate the thyroid and adrenal. Thereby, by process of deduction, I believe when the time comes, when she reaches the time of her normal onset of pubertal development and menstruation, that the pituitary will be able to function to stimulate her ovaries. However, I cannot be 100 percent certain of that. We will become a hundred percent certain of this when we see Ann go through a normal onset of pubertal development and onset of menstrual periods or when we see that she doesn't go through such normal development."

Following this answer the following exchange occurred:

"Q. Now, Doctor, are you able to state an opinion then—

"MR. FOWLER: Excuse me, let me interpose at this point an objection raised on—based on relevancy and speculation to the following questions.

"THE COURT: Yes, I've considered those and they're overruled.

"Q. Now, Doctor, are you able to state an opinion then that there is some change that when she reaches puberty that she may not go through it in the normal fashion?

"A. There is a very slight chance that that could occur secondary to the injury.

"Q. If the should happen, what will be the consequence to Ann?

"MR FOWLER: Same objection, Your Honor relevancy.

"THE COURT: Overruled. You may answer.

"A. The consequence would be that she would require medication to attempt to induce her to start having menstrual periods and to complete her secondary sexual development, which includes development of the breast and of the female, adult female body habitus. In addition, if she were unable to have any ovarian function because of lack of stimulation of the pituitary, a future consequence would be that she could be sterile.

"Q. And for—

"A. Excuse me, infertile.

"Q. But as I understand, based upon the testing that is available presently, you're not able to arrive at a conclusion within reasonable medical probability as to whether that will or will not happen; is that correct?

"A. At this time, it is most likely that it will not happen; however, I cannot guarantee that for certainty."

The trial court allowed the above testimony but gave a limiting instruction that the possibility was too remote and speculative for an award of money damages. The jury was instructed it may consider such evidence "only as it may bear on the mental anguish, if any, suffered by Ann Marie Tamplin because of the slight possibility that she may not develop normally." Star Lumber did not object to this instruction.

The jury returned a verdict, finding Star Lumber 95% at fault and Ann's parents 5% at fault, awarding $761,211.38 in total damages. The trial court entered judgment for the Tamplins in the amount of $723,150.81 (95% of the total damages). Star Lumber filed a motion for a new trial or, in the alternative, a remittitur. The trial court denied the motion.

Star Lumber appealed to the Court of Appeals, raising four issues: (1) juror misconduct; (2) improper reference to the statutory cap for pain and suffering; (3) improper expert testimony

about the slight chance Ann might fail to sexually mature; and (4) improper lay testimony about an anticipated inflation rate and improper argument by counsel regarding the rate of inflation. Star Lumber has abandoned issues 1 and 4, and our review is limited to issues 2 and 3 above.

We first consider whether the district court erred in admitting expert testimony about the slight possibility Ann may not go through puberty in a normal fashion. Star Lumber argues that the trial court erred in admitting Dr. Greenburg's testimony of a very slight chance that Ann would not go through puberty and the consequence of that slight possibility, infertility, because such evidence was speculative and conjectural. Star Lumber asserts that, although the trial court gave a limiting instruction allowing consideration of the testimony only in regard to the mental anguish suffered by Ann, there was no evidence Ann had any awareness or anxiety regarding the remote possibility. Considering the large amount awarded for nonpecuniary damages, including $250,000 for future nonpecuniary damages, compared with past medical expenses of $11,211.38, Star Lumber contends, the error was prejudicial and grounds for a new trial.

The Tamplins argue that the evidence of the slight possibility was properly admitted because "courts have long recognized" that an injured party may recover damages for mental anguish due to the fear of a future medical condition even if the chance of the occurrence is only slight or a possibility. As to Star Lumber's assertion that there was no evidence that Ann suffered mental anguish due to the possibility she may not develop normally, the Tamplins contend that issue is not properly before this court because Star Lumber did not object to the evidence on that ground at trial. The Tamplins assert, however, that there was evidence Ann was aware of the possibility, in that Ann and her mother visited Dr. Greenburg specifically for that reason. Further, the Tamplins assert that Ann's possible future medical problems were not a major consideration in the damages claimed in this case.

In affirming the trial court's admission of the testimony, the Court of Appeals relied on *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394 (5th Cir.), *cert. denied* 478 U.S. 1022 (1986). In *Jackson*, plaintiff Jackson brought a products liability action

against manufacturers of asbestos products. Jackson had suffered asbestosis but did not have cancer. The Fifth Circuit Court of Appeals held that Jackson may recover compensatory damages for the reasonable medical probability of contracting cancer in the future and for mental anguish for the fear of contracting cancer in the future. The evidence adduced at trial indicated that Jackson has a greater than 50% chance of getting cancer. 781 F.2d at 413. The Court of Appeals quoted the following from *Jackson*:

" '[Plaintiff's] fear is plainly a present injury. It is a fear which he experiences every day and every night. It is a fear which is exacerbated each time he learns that another victim of asbestos has died of lung cancer. It is fear which, regardless of whether Jackson actually gets cancer, will haunt him for the rest of his life.' *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 414 (5th Cir.), *cert. denied* 478 U.S. 1022 (1986)." 16 Kan. App. 2d at 362.

However, *Jackson* limited its holding:

"There was considerable testimony before the jury to the effect that Jackson will probably develop cancer; it is in that context that we discuss damages for mental anguish. We do not consider whether a plaintiff who cannot show that he will probably develop cancer may recover for mental distress." 781 F.2d at 413 n.25.

The Court of Appeals said it would follow *Jackson*'s rationale and concluded it was reasonable to allow the jury to consider the possibility Ann might worry that she might not enter puberty as a possible element of her mental anguish. The Court of Appeals also stated that the jury award was not out of proportion to the other damages proved in the case and concluded that the trial court did not abuse its discretion in allowing the expert testimony and claim for damages for mental anguish. 16 Kan. App. 2d at 362.

For support, Star Lumber relies upon the evidentiary rule that, during direct examination, expert witnesses must confine their opinions to relevant matters which are certain or probable, not those which are merely possible. No particular words of art are necessary; it is sufficient if the expert's words can be interpreted to show reasonable probability. *Nuney v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973). The expressions "probably," "more likely than not," and other similar phrases are proper qualifications for medical experts' opinion testimony if, taken as a whole,

the testimony reflects an honest expression of professional opinion as to reasonable medical probability. 211 Kan. 443, Syl. ¶ 2.

The Tamplins rely on the following five cases to support their argument: *Jackson,* 781 F.2d 394; *Eagle-Picher Industries, Inc. v. Cox,* 481 So. 2d 517 (Fla. Dist. App. 1985); *Mull v. Emory University, Inc.,* 114 Ga. App. 63, 150 S.E.2d 276 (1966); *Elliott v. Arrowsmith,* 149 Wash. 631, 272 Pac. 32 (1928); and *Brantner v. Jenson,* 121 Wis. 2d 658, 360 N.W.2d 529 (1985).

As previously noted, *Jackson* limited its holding, allowing damages for mental anguish due to fear of a future medical condition to the situation where such future medical condition is probable. Thus, *Jackson* is not persuasive.

*Cox,* like *Jackson,* was an action against a manufacturer of asbestos products. Cox had developed asbestosis and sued Eagle-Picher Industries, Inc., (Eagle-Picher) to recover damages for asbestosis, the risk of contracting cancer in the future, and negligent infliction of emotional distress as a result of exposure to asbestos products.

The *Cox* court allowed the evidence for the presently suffered mental distress and anxiety arising from Cox's fear of developing cancer. The court limited this "fear of" claim to the situation where the plaintiff has sustained physical injury, finding asbestosis a physical injury.

The *Cox* case is distinguishable in that the scientific evidence, though not conclusive, established a substantial possibility of developing cancer in the future. The testimony in the case at bar was that it was *unlikely* that Ann will not develop normally but that there is a *slight* possibility of such an occurrence.

In *Mull,* the plaintiff alleged that due to damage to her circulatory system, should she become pregnant there is substantial danger that she will suffer extensive complications of her pregnancy. The Georgia Court of Appeals held: "Allegations as to *probable* adverse results from an alleged tortious injury or that there was a *substantial medical possibility* of such result, which probabilities and possibilities have caused the plaintiff mental pain and suffering are properly pleaded as such element of damage." (Emphasis added.) 114 Ga. App. at 67.

Here again, the *Mull* decision is distinguishable from the present case because the alleged damages for mental pain and suffering resulted from a *substantial* possibility.

*Elliott* was a personal injury case, arising out of an automobile collision, where the jury returned a verdict against the defendants. Elliott was four months pregnant at the time of the accident. At the time of trial, she had delivered a healthy baby. On appeal, defendants claimed error in the admissions of testimony by Elliott that she worried about the possibility of a miscarriage. The Washington Supreme Court affirmed the judgment and stated the following general rule:

"[I]t is also a rule that one may recover for mental anguish caused by a *reasonable* dread of future illness or death as a result of an injury, but not for such dread as *may be vague or fanciful* or that may continue after the conditions which might result in such future illness or death have been removed." 149 Wash. at 633.

In *Brantner*, the defendant challenged the portion of the judgment awarding plaintiff Brantner damages for past, present, and future mental distress related to possible future back surgery. The surgeon was unable to state his opinions about future surgery with a reasonable degree of medical certainty. The Wisconsin Supreme Court concluded that a doctor's realistic prediction as to the possibility of future surgery, illness, or disability may give rise to the victim's reasonable fear and anxiety concerning her future health. 121 Wis. 2d at 666. However, *Brantner* stated that fear of future surgery is not recoverable when the future event is highly unlikely:

"On the other hand, fear of future surgery is not reasonably certain and a defendant would not be liable for damages for mental distress when a medical witness describes to the victim or to the jury *remotely conceivable complications* which may develop from the physical injury caused by the defendant's negligence. Anxiety about a fictitious or imagined or *highly unlikely* consequence is not a recoverable element." (Emphasis added.) 121 Wis. 2d at 666-67.

In each of the cases cited by the Tamplins, damages were allowed for mental distress due to the possibility of future medical consequences which were either based on a substantial possibility or where the fear was reasonable.

We conclude that anxiety based upon a reasonable fear that an existing injury will lead to the occurrence of a disease or condition in the future is an element of recovery. However, for the fear to be reasonable, it is not necessary to show that the prospect of such an occurrence is a medical certainty or probability. It is sufficient if there is a showing that a substantial possibility exists for such an occurrence.

In the case at bar, Dr. Greenburg testified it was unlikely that Ann would fail to develop normally; however, he could not rule out the slight possibility of such an occurrence. Thus, the possibility of the future medical consequence did not rise to a level where the fear of such an unlikely but possible future consequence was reasonable. Therefore, Dr. Greenburg's testimony regarding the slight possibility Ann may not develop properly should not have been admitted.

Having concluded the admission of Dr. Greenburg's testimony was error, we must determine if it is reversible error. "Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded." *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986).

Instruction No. 10 instructed the jury that it could consider the evidence regarding the slight possibility that Ann will fail to develop normally "only as it may bear on the mental anguish, *if any*, suffered by Ann . . . ." (Emphasis added.)

There is no evidence in the trial transcript that Ann was aware of or suffered mental anguish over the fact that there is a slight possibility she may not develop normally. Ann did not testify. Neither Mrs. Tamplin nor Mr. Tamplin testified that Ann was aware of or concerned about this possibility.

The trial court's instruction left open the possibility that Ann did not suffer mental anguish. Nevertheless, absent evidence that Ann suffered mental anguish, the instruction should not have been given. Star Lumber did not object to the instruction at trial or raise it as an issue in this appeal. Rather, Star Lumber argues that the effect of the instruction was illusory in that it allowed the jury to speculate on the possible consequences of an event that was unlikely to occur.

In the case at bar, the jury awarded $350,000 for noneconomic loss to date and $250,000 for future noneconomic loss for a total of $600,000 in noneconomic loss. The $600,000 includes $250,000 for pain and suffering. Thus, $350,000 was for other noneconomic damages which the jury was instructed on, disability, and any accompanying mental anguish. In closing argument, the Tamplins did not refer to Ann's mental anguish due to her fear that she may not develop normally. The Tamplins asked the jury for a total of $250,000 for pain and suffering, $350,000 for noneconomic loss to date, and $750,000 for future noneconomic loss. The jury awarded the amount the Tamplins asked for pain and suffering and noneconomic damages to date. However, the jury awarded only $250,000 for future noneconomic loss, $500,000 less than the Tamplins asked for in closing argument. Ann suffered three skull fractures, a fracture of the zygomatic arch, perforation of a membrane in her right ear resulting in permanent hearing loss, and damage to her pituitary gland requiring DDAVP twice a day for the rest of her life. The verdict is not out of proportion with the damages proven.

Dr. Greenburg's testimony was that it was unlikely Ann would have problems developing in the future. However, he admitted he could not rule out the slight possibility that Ann would fail to develop normally because he could not test for it. There was no evidence Ann was aware of the possibility or suffered mental anguish because of it.

Based on the size of the verdict compared with proven damages, Dr. Greenburg's testimony that it is unlikely Ann will have problems developing, and no evidence of Ann's awareness of the possibility, we find the erroneous admission of Dr. Greenburg's testimony of the slight possibility did not substantially prejudice the defendant. Nor can we reach a firm conviction that the jury would have returned a different verdict had Instruction No. 10 not been given. We hold the error to be harmless.

We next consider whether the Tamplins' counsel made an improper reference to the K.S.A. 1991 Supp. 60-19a01 $250,000 cap on pain and suffering, and, if so, if such reference constitutes reversible error. In closing argument, the Tamplins' counsel, while discussing the damages and the verdict form, told the jury that it was going to be asked how much of the noneconomic

damages were for pain and suffering. Counsel stated: "That question . . . is an informal question only. You're answering for reasons I'm not permitted to tell you, it's an informal finding for the Court." Later in closing argument, the Tamplins' counsel stated:

"Who would say the pain and suffering that occurred to Ann in this case at $250,000 would be an excessive amount of money? Now, I'm going to suggest to you that when you search your conscience you're going to find that a larger amount of money would be fair, but we are asking you to award that amount of money and not one penny more for reasons I can't explain to you, I'm not permitted. That's the figure we're asking for. Whatever you do, whatever you feel about it, we do not want you to award more than $250,000 for pain and suffering."

Star Lumber argues that Tamplins' counsel's remarks in closing argument improperly referenced the $250,000 statutory cap in K.S.A. 1991 Supp. 60-19a01. Star Lumber contends that, absent knowledge of the cap, the jury would have awarded more than $250,000 for pain and suffering out of the $600,000 it awarded for noneconomic loss. Star Lumber asserts the improper reference to the cap is prejudicial error requiring a new trial.

The Tamplins assert that this issue is not properly before this court because Star Lumber never made a contemporaneous objection to the oral argument and never raised the issue at the trial court in its motion for a new trial or the hearing on the motion for a new trial. In fact, the Tamplins contend, the issue was raised for the first time when Star Lumber filed its brief in the Court of Appeals.

A review of the record indicates that the Tamplins are correct. Star Lumber did not object to the remarks contemporaneously or after the jury retired. Star Lumber did not raise the issue in its motion for a new trial or at any time in the trial court. An issue not raised before or presented to the trial court cannot be raised for the first time on appeal. *Kansas Dept. of Revenue v. Coca Cola Co.,* 240 Kan. 548, 552, 731 P.2d 273 (1987). Thus, this issue was not properly raised in this appeal.

Although noting the absence of an objection and that Star Lumber failed to raise the issue in the motion for a new trial, the Court of Appeals, nevertheless, addressed the issue on the merits, concluding:

"As no Kansas case has ever held that counsel should not inform the jury of the statutory cap and since it is not clear that counsel did so inform the jury, this is clearly not improper beyond question. Even if it were, an objection would still seem necessary. For those reasons, we find no abuse of discretion in the denial of the motion for a new trial on this basis." 16 Kan. App. 2d at 360.

We agree that counsel did not specifically inform the jury of the statutory cap; however, we disagree with the implication in the above statement, that it may be permissible for counsel to do so. The applicable statute to the case at bar is K.S.A. 1991 Supp. 60-19a01. K.S.A. 1991 Supp. 60-19a01 applies to personal injury actions accruing on or after July 1, 1987, and before July 1, 1988. K.S.A. 1991 Supp. 60-19a01(f). Ann's cause of action accrued on November 5, 1987. K.S.A. 1991 Supp. 60-19a02 applies to personal injury actions accruing on or after July 1, 1988. K.S.A. 1991 Supp. 60-19a02(f). The major difference between the two statutes is that 60-19a01(b) limits a plaintiff's recovery for *pain and suffering* to $250,000 while 60-19a02(b) limits a plaintiff's recovery for *noneconomic loss* to $250,000.

K.S.A. 1991 Supp. 60-19a01(c) requires the trier of fact to itemize the amount awarded for pain and suffering. K.S.A. 1991 Supp. 60-19a01(d) provides, in part:

"If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for pain and suffering which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for pain and suffering."

This provision is a clear indication of legislative intent that the jury should not be informed of the statutory cap. Although 60-19a01(d) refers only to the court, the legislative intent would be frustrated if counsel were allowed to inform the jury of the cap while the trial court could not. This constraint applies as well to counsel's editorial comments that "for reasons I can't explain" and "for reasons I'm not permitted to tell you," the jury should award no more than $250,000 for pain and suffering. However, it is proper for an attorney to tell the jury that the plaintiff is only asking for $250,000 for noneconomic loss or that plaintiff's claim for such loss is limited to $250,000. We disapprove of Syllabus ¶ 2 and the corresponding portion of the Court of Appeals' opin-

ion holding that the comments of counsel did not constitute an improper reference to the statutory cap.

We agree with the Court of Appeals that there is no reversible error and that the jury verdict should be affirmed. The judgment of the district court is affirmed, and the judgment of the Court of Appeals is affirmed as modified.