(28 P.3d 1051)

85,530

MATTHEW JONES, *Plaintiff/Appellee*, v. RELIABLE SECURITY INCORPORATION, INC., DEQUINCE ATKINSON, d/b/a RELIABLE SECURITY AND INVESTIGATIONS, *Defendant*, v. ACCEPTANCE INSURANCE COMPANY, *Garnishee/Appellant*.

Opinion filed August 10, 2001.

*John G. Schultz* and *Lisa A. Brunner*, of Franke & Schultz, P.C., of Kansas City, Missouri, for appellant.

*Donald W. Vasos* and *David A. Hoffman*, of Vasos Law Offices, of Shawnee Mission, for appellee.

Before MARQUARDT, P.J., JOHNSON, J., and JACKSON, S.J.

JACKSON, J.: Acceptance Insurance Company (Acceptance), appeals the trial court's ruling finding it liable for a judgment entered against its insured, Reliable Security, Inc. (Reliable), because Acceptance breached its contractual duty to act in good faith when Acceptance refused to defend or indemnify Reliable in a tort claim brought against it by Matthew Jones. We reverse.

Reliable is a Missouri company in the business of providing private armed security services to the public. In June 1994, Reliable submitted an application for insurance through Marino & Wolf, Inc. (M&W), insurance agents located in Kansas. M&W sent the application to Chris-Leef General Agency, Inc. (CLGA), also located in Kansas. CLGA acts as a managing general agent for several different insurance companies. CLGA provides insurance to independent agents such as M&W for insureds who are unable to obtain a policy through the normal marketplace.

Prior to 1994, Reliable was insured through Scottsdale Insurance Company (Scottsdale). The Scottsdale policy did not have an assault and battery exclusion. It appears that there was a question as to whether Scottsdale would continue to insure Reliable under the same terms. M&W asked CLGA to find a policy for Reliable. CLGA advised M&W that Scottsdale would insure Reliable, but a policy from Acceptance would cost less.

Scottsdale and Acceptance are surplus line insurance carriers who are only allowed to issue policies in Kansas through general agents licensed in Kansas. See K.S.A. 40-4117. The insurance forms of these carriers do not have to be approved by the Kansas Insurance Department. Insureds purchase these policies because they are unable to purchase insurance from other companies. There are no statutes, written regulations, or proclamations by the Kansas Insurance Department prohibiting the use of an assault and battery exclusion in policies issued in Kansas.

In April 1994, CLGA advised M&W that it could write an Acceptance policy for Reliable. The proposed policy sent to M&W indicated that an assault and battery exclusion was included. In June 1994, CLGA issued a coverage binder for Reliable through Acceptance. The binder indicated that the policy had an exclusion for assault and battery. The policy limits were $1,000,000. M&W returned the binder signed by one of its agents. No one from M&W asked CLGA to remove the exclusion prior to March 1997, or questioned the exclusion. CLGA knew that Reliable had previously been insured by Scottsdale, but it was not aware of the policy terms and did not have a copy of that policy.

The policy issued by Acceptance was compiled by Gary Peterson at CLGA. Peterson intentionally included the assault and battery exclusion in Reliable's policy. Peterson believed that Acceptance required this exclusion in policies for security companies. He also testified that it was his practice to include this exclusion in any policy issued for this type of risk. The exclusion form was among the forms he received from Acceptance. Peterson believed that adding the exclusion in this policy was prudent in underwriting the risk.

The record on appeal is not clear as to when Reliable received a copy of the policy. Scott Brown, counsel for Reliable in the underlying claim, testified that Reliable's owner reviewed the Acceptance policy initially, but may not have read it word for word. Brown later testified that he was not sure Reliable received a copy of the policy until he requested it after Jones' suit was filed. There is no direct testimony from Reliable's owner in the record on appeal.

Reliable renewed the Acceptance policy for June 1995 to June 1996 and June 1996 to June 1997. These policies also contained an assault and battery exclusion which stated:

"It is agreed that this policy does not cover any claims arising out of Assault and Battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of you, your employees or volunteers, patrons or any other persons. Claims, accusations or charges of negligent hiring, placement, training or supervision arising from any of the foregoing are not covered. Furthermore, we shall have no obligation to defend you, or any other insured, for any such loss, claim or suit."

This exclusion is on a form developed by Acceptance.

The policy also contained a Detective or Patrol Agency Endorsement (Patrol Endorsement), which provided, in part:

"1. This insurance provides coverage for sums which you become legally obligated to pay because of any negligent act, error or omission committed during the policy period in the conduct of the operations shown above [Security Patrol], whether committed by you or by any person for whom you are legally responsible.

. . . .

"3. *In addition to those exclusions already found in the coverage form*, this insurance does not apply to any dishonest, fraudulent, criminal or malicious act or omission of yours, any partner or employee or to any allegations against you that

such loss arose out of your failure to properly hire, train or supervise any employee." (Emphasis added.)

Jones was shot and severely injured by a third party on March 1, 1997, in Kansas City, Kansas, while attending a wedding reception. Reliable had been hired to provide armed security at the event.

On April 22, 1998, Jones filed a civil action against Reliable in Wyandotte County District Court. In the petition, Jones alleged that he was shot and asserted Reliable was negligent in failing to (1) warn or protect him from the assailant; (2) expel, disarm, or subdue the assailant; (3) have a sufficient number of trained security guards on duty; (4) promptly call the police; and (5) use ordinary care in providing adequate security.

Jones requested $2,000,000 in damages. Reliable filed an answer denying it was negligent. Reliable made demand on Acceptance to defend it in the suit. Acceptance's litigation specialist, Rob Plenger, reviewed the policy, summons, and complaint. In a letter to Reliable, Acceptance cited the assault and battery exclusion, disclaimed coverage, and declined to provide a defense. The letter indicated that Acceptance's decision was based on all facts "presently available" and invited Reliable to notify it if there was any additional information relevant to the case or if an amended petition was filed. Acceptance also notified Jones that his claim was not covered under the policy.

Shortly thereafter, Jones offered to settle all claims it had against Reliable for the policy limits or $5,000,000, whichever was less.

In June 1998, Peterson faxed a copy of the Patrol Endorsement to Plenger and asked him to review it to determine if it provided coverage for Jones' claim. Plenger discussed the endorsement with Peterson and his supervisor. They both agreed that the exclusion still applied to Jones' claim.

In October 1998, Reliable's attorney sent a letter to Acceptance. Counsel asserted that (1) Reliable assumed that it was buying a defense to any claim brought against it and it had such coverage in the past; (2) Reliable was not notified of the exclusion by M&W or Acceptance; and (3) the exclusion was against public policy be-

cause Reliable was required to have such coverage under local law. Counsel cited a Louisiana case, *Hickey v. Centenary Oyster House*, 690 So. 2d 858 (La. App. 1997) as authority for his argument.

Plenger discussed counsel's letter with Acceptance's claims counsel. They found that *Hickey* had been overruled and found a Kansas Supreme Court case, *First Financial Insurance v. Bugg*, 265 Kan. 690, 962 P.2d 515 (1998), which upheld an assault and battery exclusion. See *Hickey v. Centenary Oyster House*, 719 So. 2d 421 (La. 1998). Accordingly, Acceptance sent another letter to Brown and refused to defend based on the exclusion and included copies of the *Hickey* and *Bugg* cases. CLGA also was notified about Acceptance's refusal to defend Reliable.

On March 10, 1999, Jones and Reliable entered into a written settlement agreement. The parties agreed that the matter should proceed to trial and Jones would be assessed 10% at fault and Reliable 90% at fault. The parties also agreed as to the evidence of damages that Jones would introduce at trial, and the end result would be a judgment entered against Reliable for $1,400,000.

The parties proceeded to a bench trial on March 11, 1999. The trial court entered judgment for Jones in the amount of $1,400,000 based on the fault percentages and damages set forth in the settlement agreement.

In May 1999, Jones and Reliable signed a Covenant Not to Execute and Assignment of Claims. In this agreement, Reliable assigned to Jones any claims against Acceptance Insurance Company arising out of its negligent or bad faith failure or refusal to defend or settle within policy limits. In exchange, Jones agreed not to pursue the collection of Reliable's assets.

Shortly thereafter, a request for garnishment was filed against Acceptance. Acceptance filed a timely answer, denying that the company held any money or indebtedness to Reliable and attached a copy of its denial letter to its answer.

In the garnishment action, Jones asserted that (1) Reliable was not aware the exclusion was in the policy and would not have purchased it had it known of the exclusion; (2) the Patrol Endorsement is inconsistent with the exclusion and therefore, negated it; (3) the exclusion was unenforceable because of fraud, the policy provided

only illusory coverage, and was inconsistent with Reliable's reasonable expectations of coverage. Jones further alleged that Acceptance breached its duties to Reliable by failing to settle within the policy limits and properly investigate Jones' claims.

Extensive discovery followed, which included several motions to compel filed by Jones. In December 1999, Acceptance filed a motion for summary judgment and argued that Missouri law applied. The trial court overruled the motion at trial.

On February 1, 2000, Jones' claims against Acceptance proceeded to a bench trial. At trial, various exhibits from the underlying litigation and various discovery records from the garnishment action were admitted into evidence.

Jones called several witnesses on his behalf. Attorney Scott Brown testified at trial about his representation of Reliable and his communications with Acceptance. Jones also presented the testimony of two insurance experts. These witnesses testified that Acceptance's policy extended coverage for Jones' claims under the Patrol Endorsement. They testified that Acceptance's assault and battery exclusion rendered the policy virtually useless. They testified that the exclusion deviated from generally accepted standards applicable to insurance companies, and industry practice would be to get the insured to sign such an exclusion. They also testified that Acceptance did not conduct a reasonable investigation, especially after CLGA inquired about coverage under the Patrol Endorsement.

Acceptance also presented the testimony of its own insurance expert, who testified that (1) assault and battery exclusions were common in policies issued to security companies; (2) it was not unusual for surplus line companies to allow experienced general agents to underwrite policies and use their discretion in including nonmandatory forms; (3) the Patrol Endorsement and exclusion were not mutually repugnant; (4) the Acceptance policy provided coverage to Reliable for a variety of claims; and (5) Acceptance adequately investigated Jones' claim in denying coverage.

David Seaholm, a former Acceptance underwriter, testified for Acceptance. Seaholm testified that neither the insurer nor the broker normally have any direct contact with the insured and all con-

tact is done through the retailer. Seaholm testified that CLGA had authority to include the assault and battery exclusion in policies it issued through Acceptance, although he did not know why CLGA included the exclusion in this particular policy. He testified that each policy CLGA writes gets reviewed by Acceptance, and this exclusion in a security company's policy would not raise a red flag during its review. While the exclusion is not mandated by Acceptance, it is up to the discretion of the underwriter to include it. Seaholm testified that the policy issued provided significant coverage, even with the exclusion.

On June 6, 2000, the trial court entered its journal entry ruling in favor of Jones. The trial court concluded that Reliable believed Acceptance's policy was the same type of coverage it previously had from another carrier, *i.e.*, without an assault and battery exclusion. The trial court found that because Acceptance did not know why the exclusion was added to Reliable's policy, Acceptance "believed that it was insuring Reliable for acts arising out of an assault and battery situation." The trial court applied Kansas law and found that the assault and battery exclusion conflicts with and was repugnant to the Patrol Endorsement. The trial court found the policy ambiguous and the trial court concluded that the policy provided coverage for Jones' claim.

Finally, the trial court concluded that Acceptance was negligent in the investigation of Jones' claim and acted in bad faith. The trial court found that Acceptance's investigation was unreasonable in failing to investigate the "situation surrounding the purchase of this policy." Specifically, the trial court stated:

"Upon receipt of plaintiff's claim Plenger summarily denied coverage based upon the assault and battery exclusion. Had he investigated further and consulted the underwriting department at [Acceptance] he would have determined that [Acceptance] did not require an assault and battery exclusion in a policy such as this and that it was only included in this policy because of the mistaken belief by Gary Peterson of the managing general agency that such an exclusion was required. He further would have learned that just prior to Reliable purchasing the contract of insurance from [Acceptance] it had been insured by the Scottsdale Insurance Company and that that policy contained no such exclusion and further that Scottsdale had on a previous occasion paid for a claim arising out of a situation in which assault and battery was involved."

.

Consequently, the trial court found that Acceptance was liable for the entire judgment, even that in excess of the policy limits.

## Application of Kansas Law

In its first issue on appeal, Acceptance argues that the trial court erred in applying Kansas law in this case. Acceptance argues that the policy was delivered to Reliable in Missouri and Missouri law should control all issues.

When there is a question of which state law applies, it is typically a question of law over which this court exercises unlimited review. *Resolution Trust Corp. v. Atchity*, 259 Kan. 584, 590, 913 P.2d 162 (1996).

Under traditional conflicts theory, the law of the place the contract is to be performed is applied when the issue calls for the determination of " 'the manner and method as well as the legality of the acts required for performance.' " *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan. App. 2d 839, 848, 21 P.3d 1011, 1018 (2001). In *Aselco*, as in this case, the insurance company was garnished based on allegations that it breached its duty to defend. This court applied Kansas law because the insurer's duty to defend would have been performed in Kansas, where the underlying claims against the insured were litigated.

After reviewing the briefs of counsel, we have concluded that this issue is moot. Acceptance concedes in its brief that Kansas and Missouri law do not differ significantly on the issues presented in this case. Our research confirms this fact. Thus, Acceptance has failed to establish that this claimed error was prejudicial. Harmless errors, which do not prejudice the substantial rights of the parties provide no basis for reversal of a judgment and should be disregarded. *Tamplin v. Star Lumber and Supply Co.*, 251 Kan. 300, 308, 836 P.2d 1102 (1992).

## Acceptance's Breach of Duty

The trial court held that Acceptance was liable for Jones' entire judgment because it breached its duty to defend Reliable in the underlying litigation.

The duty to defend and whether the policy provides coverage are not necessarily coextensive. The duty to defend arises whenever

.there is a potential of liability under the policy. The insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint or petition and considering any facts brought to its attention or which it could reasonably discover. Where a petition alleges an act that is clearly not covered, for example, that the defendant acted willfully and intentionally, there would be no potential of liability under the policy for intentional acts. Where the complaint alleges both a negligent and intentional act, these alleged facts give rise to the potential for liability, and the duty to defend arises. *Quality Painting, Inc. v. Truck Ins. Exchange*, 26 Kan. App. 2d 473, 476, 988 P.2d 749 (1999).

Whether an insurer has breached the duty to defend is often a mixed question of law and fact. As in this case, there are issues pertaining to the interpretation of the insurance policy, which calls for de novo review.

Distilling Jones' claims to their essence, Jones asserts that Acceptance had a duty to defend because the policy's coverage was ambiguous and Acceptance failed to adequately investigate the claim. As part of the "failure to investigate" assertion, Jones appears to assert that an adequate investigation would have disclosed that Acceptance (or someone else) was negligent in procuring and issuing the policy Reliable received, and the exclusion was invalid because of mutual mistake of the parties. Each of these arguments will be addressed separately.

### *Ambiguous Policy Provisions*

Jones asserted and the trial court found that the Patrol Endorsement and assault and battery exclusion were mutually repugnant and, therefore, created an ambiguity in the contract.

The interpretation of a written contract is a question of law. Regardless of the trial court's interpretation, the appellate court may construe the instrument de novo and determine its effect. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998).

For a contract to be found ambiguous, it must contain language of doubtful or conflicting meaning based on a natural and reasonable interpretation of the agreement's language. A contract is am-

biguous if, after applying appropriate rules of interpretation to the face of the instrument, there remains a genuine uncertainty which one of two or more meanings is the proper meaning. *Brumley v. Lee*, 265 Kan. 810, 813, 963 P.2d 1224 (1998).

Courts should not look for ambiguities or uncertainties where common sense says there are none. *Eggleston v. State Farm Mut. Auto Ins. Co.*, 21 Kan. App. 2d 573, 574, 906 P.2d 661, *rev. denied* 257 Kan. 1091 (1995). The fact that the parties disagree over the meaning of the terms does not establish the contract is ambiguous. *Ryco Packaging Corp. v. Chapelle Int'l. Ltd.*, 23 Kan. App. 2d 30, 36, 926 P.2d 669 (1996), *rev. denied* 261 Kan. 1086 (1997).

In this case, the Patrol Endorsement extended coverage to Reliable for acts of negligence in carrying out its security patrol operations. However, paragraph 3 of the endorsement clearly indicates that the coverage was subject to exclusions. Specifically, that endorsement states in pertinent part:

"*In addition to those exclusions already found in the coverage form*, this insurance does not apply to any dishonest, fraudulent, criminal or malicious act or omission of yours, any partner or employee or to any allegations against you that such loss arose out of your failure to properly hire, train or supervise any employee." (Emphasis added.)

By expressly referencing the exclusions in the policy, it is clear that the Patrol Endorsement does not override those exclusions.

Our courts have held that to determine whether an insurance contract is ambiguous we must consider, not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean. *Hodgson v. Bremen Farmers' Mut. Ins. Co.*, 27 Kan. App. 2d 231, 233, 3 P.3d 1281 (1999). This should not be confused with the insured's uninformed expectations of the policy coverage; it only requires the policy to be read as a reasonably prudent insured would read it. Where an insurance contract is not ambiguous, the courts will not make another contract for the parties but will enforce the contract as written. *Elliott v. Farm Bureau Ins. Co. Inc.*, 26 Kan. App. 2d 790, 793, 995 P.2d 885 (1999), *rev. denied* 269 Kan. 932 (2000).

Jones' experts testified that the assault and battery exclusion, standing alone, was not ambiguous. Instead, they testified that the

Patrol Endorsement and exclusion conflicted and, therefore, created an ambiguity. However, whether a contract is ambiguous is a question of law for the court; the mere fact the parties disagree as to the meaning of language does not require this court to find an ambiguity. *Ryco Packaging*, 23 Kan. App. 2d at 35-36.

Here, the assault and battery exclusion was not ambiguous. It clearly excluded coverage and any duty to defend in cases where the claims against the insured, whether based on intentional torts or negligence theories, arose from an assault and battery. In addition, the exclusion was not rendered ambiguous by the broad language of the Patrol Endorsement. The Patrol Endorsement's unequivocal recognition of the exclusions elsewhere in the policy undermines any claim that a reasonable insured reading the language would believe the exclusion was abrogated or limited by the Patrol Endorsement.

Jones' reliance on *Brumley* is misplaced. *Brumley* involved a lawsuit filed against two homeowners arising from the death of a child in their care. The appeal arose from the question of whether the defendants' homeowner's policy provided coverage for the losses claimed as a result of the death. In this case, the policy excluded coverage for bodily injury which was "expected or intended by *any* insured" while at the same time indicating the insurance *"applies separately to each insured."* 265 Kan. at 813. In the civil case filed against the insureds, one insured was accused of intentionally striking the child, resulting in its death. Another insured was accused of negligence. The Supreme Court found that the use of the term "any" in the exclusion was ambiguous. In construing the severability clause in light of this ambiguity, the court held that the policy afforded coverage for a negligent insured, even if the incident also involved the intentional act of another insured. 265 Kan. at 815.

If Acceptance's policy only excluded coverage for intentional acts, *Brumley* might carry some weight in this case. However, the exclusion at issue clearly disallowed coverage for any claim arising from assault and battery, even if the battery was committed by a third person and if the claims asserted the insured was negligent in connection with the battery.

This case more squarely falls within the Supreme Court's decision in *Bugg*. In *Bugg*, plaintiffs were shot in a tavern during a disturbance when the tavern's agents and a third person exchanged gunfire. The tavern's insurer sought declaratory judgment, claiming that no insurance coverage was available for the claims. The policy excluded coverage for bodily injury "[e]xpected or intended from the standpoint of any insured" or "[a]rising out of assault or battery, or out of any act or omission in connection with the prevention or suppression of an assault or battery." 265 Kan. at 692-93.

The Supreme Court in *Bugg* rejected the trial court's finding that the policy was ambiguous and the exclusion was concealed. 265 Kan. at 698. The court noted that an insurance policy can provide coverage while qualifying or limiting coverage with a clear and unambiguous exception. 265 Kan. at 698. The court found that the assault and battery exclusion was not ambiguous and cited a number of cases from other states reaching a similar conclusion. 265 Kan. at 699-704. Finally, the Supreme Court found that the clear terms of the exclusion applied, regardless of the theory of liability as long as the injuries arose out of an assault and battery. 265 Kan. at 706. Thus, the fact that plaintiffs sued asserting the insured was negligent did not avoid the application of the exclusion. 265 Kan. at 706-07.

Based upon the language of the policy, the terms of coverage in this case were not ambiguous. A reasonably prudent person who read the policy would not be confused by the Patrol Endorsement or the exclusion. For these reasons, the trial court erred in concluding that the policy was ambiguous.

### *Acceptance's Duty to Defend and Failure to Adequately Investigate Jones' Claim*

The trial court determined that had a reasonable investigation been done, Acceptance would have discovered CLGA issued the policy with an exclusion not mandated by Acceptance's underwriting guidelines. The trial court also found that Acceptance had a duty to investigate whether the policy issued met with Reliable's expectations of coverage.

The difficulty with the trial court's reasoning and Jones' arguments is that Jones is attempting to "bootstrap" a claim of negligent failure to procure an adequate policy into a duty to defend case. This case really turns on the scope of Acceptance's duty to defend. Whether a duty exists is a question of law over which this court has unlimited review. *Fountain v. Se-Kan Asphalt Services, Inc.*, 17 Kan. App. 2d 323, 327, 837 P.2d 835, *rev. denied* 251 Kan. 937 (1992).

Under standard "duty to defend" cases, the courts recognize an insurer has a duty to defend if there is any potential of liability *under the policy*. Generally, the insurer must determine if there is a potential of liability *under the policy* by examining the petition and considering any facts which are brought to its attention or which it could reasonably discover. *Quality Painting*, 26 Kan. App. 2d at 476.

In this case, there is no dispute that when Acceptance received notice of Jones' claims, its agent reviewed the pleadings and the policy. In addition, Plenger contacted the insured and M&W about the facts of the claim. Acceptance's initial denial letter set forth the basis for denial of the claim and refusal to defend, quoted the exclusion, and invited the insured to submit any additional information or amended pleadings. After CLGA contacted Plenger, he again reviewed the exclusion and endorsement with his supervisor. After receiving a letter from Reliable's attorney, Plenger reviewed the policies and authorities cited by Reliable with the claims attorney at Acceptance.

Jones cites to no authority which states that an insurer's duty to defend can be triggered by a claim the insured was ignorant of the policy's terms or a claim of negligence in procuring or issuing the policy. If this were the case, an insurer could be forced to defend a claim clearly outside coverage simply by an insured claiming that he did not know of the lack of coverage.

Jones' claims in this case are essentially for breach of the contract to procure insurance, or negligence in procuring insurance, and/or reformation of the contract because of mutual mistake. This court has recognized the difference between a claim against an insurer based on a policy and a claim for negligent procurement of a policy.

See *Weinlood v. Fisher & Assocs., Inc.*, 26 Kan. App. 2d 20, 22, 975 P.2d 1226 (1999); *Marshel Investments, Inc. v. Cohen*, 6 Kan. App. 2d 672, 682, 634 P.2d 133 (1981). It is unreasonable to link the duty to defend to an alleged breach of a different legal duty—the duty to act with reasonable care when procuring a policy for an insured. These duties arise from different sources, provide for different damages, and allow for different proof and defenses.

We have examined the cases cited by Jones, *Barth v. Coleman*, 118 N.M. 1, 878 P.2d 319 (1994), and *National Fire v. Hoene Springs Improvement Association*, 889 F. Supp. 362 (E.D. Mo. 1995), and have concluded that they do not establish that negligent procurement triggers a duty to defend under a policy. We find them factually distinguishable from the case at bar.

A claim for negligent procurement of the policy does not create a potential for "liability under the policy" and should not provide a basis for a claim for bad faith failure to defend. Based on the record on appeal before the court, Acceptance only owed a duty to review the policy and investigate the nature of Jones' claim. Acceptance did a reasonable investigation of Jones' claim and reasonably concluded that Jones was not covered under the clear terms of the policy. The trial court's conclusion that Acceptance did not adequately investigate and acted in bad faith in refusing to defend was erroneous.

### Mutual Mistake

The trial court concluded that Acceptance acted in bad faith in failing to defend because the assault and battery exclusion was added to the policy as a result of a mutual mistake by the parties. The trial court concluded that a reasonable investigation would have resulted in Acceptance learning of this mutual mistake. In essence, the trial court reformed the contract under the mutual mistake doctrine.

To the extent the trial court's ruling is based on the scope of Acceptance's duty to investigate, the issue raises a question of law over which this court has unlimited review. *Fountain*, 17 Kan. App. 2d at 327.

Regardless of the standard of review applied, we find that the trial court's ruling based upon mutual mistake is erroneous. First, a claim attacking contract formation does not establish a potential liability under the policy to trigger a duty to defend as discussed above. Instead, it is a separate claim seeking to rewrite the policy itself.

Second, the record on appeal before the court fails to establish that a mutual mistake occurred. It seems tenuous to find a mistake on the part of Reliable with respect to the terms of the policy. The original policy issued by Acceptance in 1994 contained the assault and battery exclusion. There is no direct evidence that Reliable did not receive the policy. Generally, Kansas recognizes some obligation on the insured to review and understand an insurance policy. See *Geiger-Schorr v. Todd*, 21 Kan. App. 2d 1, 10, 901 P.2d 515 (1995); *Miner v. Farm Bur. Mut. Ins. Co., Inc.*, 17 Kan. App. 2d 598, 609, 841 P.2d 1093 (1992), *rev. denied* 252 Kan. 1092 (1993). Moreover, a party seeking equitable relief must take reasonable action to protect his own interests. Generally, equity aids the vigilant and not those who slumber on their rights. *Robinson v. Shah*, 23 Kan. App. 2d 812, 831, 936 P.2d 784 (1997). A vigilant insured paying significant premiums should be expected to obtain and read a copy of the policy some time during the 3 years of its existence.

Even if there is some evidence of mistake on the part of Reliable, there is no evidence of a "mutual" mistake.

" 'The equitable remedy of reformation of written instruments is the remedy afforded by courts of equity to the parties and the privies of parties to written instruments which import a legal obligation, to reform or rectify such instruments whenever they fail, through mistake or fraud, or a combination of fraud and mistake, *to express the real agreement or intention of the parties.*' " (Emphasis added.) *In re Marriage of Jones*, 22 Kan. App. 2d 753, 761-62, 921 P.2d 839, *rev. denied* 260 Kan. 993 (1996).

Kansas has recognized the equitable remedy of reformation to reform written instruments. See *Conner v. Koch Oil Co.*, 245 Kan. 250, 254, 777 P.2d 821 (1989); *Schlatter v. Ibarra*, 218 Kan. 67, 70, 542 P.2d 710 (1975). Reformation by its very definition is "[a]n equitable remedy by which a court will modify a written agreement

to reflect the actual intent of the parties." Black's Law Dictionary 1285 (7th ed. 1999).

In this case, there is no evidence of a mutual mistake. While Peterson might have been mistaken in believing Acceptance mandated the assault and battery exclusion in this type of policy, he intentionally inserted the exclusion in the policy and intended it to be part of the contract. M&W assented to the terms of the policy by signing the binder which listed the exclusion on its face.

Moreover, there was no evidence that Acceptance was unaware of the exclusion in this policy. Acceptance reviewed every policy put together by CLGA and either accepted it or requested further action. While Acceptance's in-house underwriter did not know why CLGA placed the exclusion in this particular policy, Acceptance left that decision to CLGA because it was more knowledgeable of the risks. The presence of the exclusion would not raise a red flag when reviewed by Acceptance.

The mutual intent of CLGA and M&W, as reflected in the documents, was for the exclusion to be part of the policy. No one from M&W testified and there is no evidence that it believed the exclusion would not be part of the policy. There is no evidence in the record on appeal that Acceptance and Reliable intended for the policy *not* to have the exclusion. Even if Reliable did not intend for the exclusion to be included, its intent only constitutes a unilateral mistake.

Granted, a written instrument may be reformed where there is ignorance or mistake on one side and fraud or inequitable conduct on the other; this can occur where one party to an instrument has made a mistake and the other knows it and fails to inform him or her of the mistake or conceals the truth from him or her. *Andres v. Claassen*, 238 Kan. 732, 740, 714 P.2d 963 (1986). In addition, an instrument prepared by one party not in accord with a prior agreement of the parties as to its terms, when executed by the other without observing the mistake in the instrument, may be reformed where it is clearly shown one party was mistaken and the other party acted inequitably. *Russell v. Ely*, 133 Kan. 318, 320-21, 299 Pac. 619 (1931).

In this case, however, there is no evidence that Acceptance or CLGA issued the policy containing the exclusion knowing it was inconsistent with any prior understanding it had with Reliable. CLGA presented an offer to M&W to issue the policy with the exclusion noted and M&W signed the offer. CLGA then issued a binder, again noting that the exclusion was included and M&W signed the binder. There is no evidence that CLGA knew of the terms of Reliable's prior coverage, and the application did not specifically request coverage for assault and battery claims. The exclusion was noted in the preparatory documents and was not concealed within the policy. Therefore, there is no basis to support a finding of inequitable conduct by Acceptance.

The purpose of reformation of a contract is not to make a new contract or to supply terms upon which the minds of the parties have not met. *Jones v. Crowell*, 164 Kan. 261, 264, 188 P.2d 908 (1948). The prevailing rule in Kansas does not permit reformation of a contract in instances involving unilateral mistake. *Squires v. Woodbury*, 5 Kan. App. 2d 596, 599, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981). Therefore, Jones cannot use Reliable's unilateral mistake to rewrite the contract on terms upon where there was no meeting of the minds. Again, Reliable's remedy is the negligent procurement claim.

Finally, Acceptance was not put on notice and could not have discovered any basis for a mutual mistake in investigating Jones' claims. Reliable's information to the insurer merely asserted it was ignorant of the exclusion; there is no mention of a mutual mistake. Even if Reliable would have investigated the matter, it would have discovered that CLGA intentionally included the exclusion, the exclusion was made known to M&W, and M&W assented to those terms.

Assuming that the claim for reformation was properly before the court, the trial court erred in concluding a mutual mistake occurred in this case. The trial court's finding of mutual mistake is not supported by substantial competent evidence and is contrary to well-established Kansas law.

The judgment of the trial court is reversed and judgment is entered in favor of Acceptance.