No. 63,845

FLETCHER BELL, COMMISSIONER OF INSURANCE, AS ADMINISTRA-
TOR OF THE KANSAS HEALTH CARE STABILIZATION FUND, *et al.*,
*Appellants*, v. JESSICA M. SIMON, a Minor, HATTIE FILLEN-
WARTH, and STEPHEN J. BAZZANO, D.O., *Appellees*.

(790 P.2d 925)

Opinion
filed April 13, 1990.

*Paul Hasty, Jr.*, of Wallace, Saunders, Austin, Brown & Enochs, Char-
tered, of Overland Park, argued the cause, and *Bradley S. Russell*, of the
same firm, was with him on the briefs for appellants.

*Patrick C. Smith*, of Fisher, Heck & Cavanaugh, P.A., of Topeka, argued
the cause and Stephen W. Cavanaugh, of the same firm, was on the briefs
for appellee Stephen J. Bazzano, D.O.

*Timothy A. Short*, of Spigarelli, McLane & Short, of Pittsburg, argued
the cause, and *Fred Spigarelli*, of the same firm, was with him on the briefs
for appellees Jessica M. Simon, a minor, and Hattie Fillenwarth.

*Jack Peggs*, of Law Office of Jack Peggs, of Wichita, and *Mark Sachse*,
of Callen, Sexton & Shelor, of Kansas City, were on the brief for *amicus
curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

HOLMES, J.: Fletcher Bell, Commissioner of Insurance, as Ad-
ministrator of the Kansas Health Care Stabilization Fund (Com-

missioner), the State of Kansas, as Trustee for the Kansas Health Care Stabilization Fund, and The Kansas Health Care Stabilization Fund (Fund), plaintiffs, appeal from an adverse judgment of the Shawnee County District Court in a declaratory judgment action. The district court granted summary judgment to the defendants and held that the Fund provided defendant Stephen J. Bazzano, D.O., excess coverage in the pending malpractice claims of the defendants Jessica M. Simon and Hattie Fillenwarth. We affirm.

The facts pertinent to this appeal are essentially undisputed. The defendant, Dr. Bazzano, is a resident of Missouri and a doctor of osteopathic medicine who is licensed to practice in both Kansas and Missouri. Defendant conducts his Kansas practice from a clinic in Galena, Cherokee County, Kansas. From 1976 to April 1, 1986, Dr. Bazzano maintained individual malpractice insurance with Professional Mutual Insurance Company (PMIC), in the form of an "occurrence" policy. The policy was renewed annually, with the last renewal for the period from April 1, 1985 to April 1, 1986. While the policy was in effect, PMIC filed a "Notice of Basic Coverage," collected the annual premium surcharge from Dr. Bazzano, and sent the surcharge and other relevant information to the Fund. The Commissioner and the Fund apparently made no objection to the type of policy, or the method of reporting and payment of the surcharge by PMIC and Dr. Bazzano, during the ten years the policy was in effect.

Dr. Bazzano admits he practiced in Kansas from April 1, 1986, to July 16, 1987, without obtaining a malpractice insurance policy that complied with the mandatory provisions of the Health Care Provider Insurance Availability Act (Act), K.S.A. 40-3401 *et seq.* Effective July 16, 1987, Dr. Bazzano obtained a "claims made" policy from Professional Mutual Insurance Company Risk Retention Group and paid the annual premium surcharge to the Fund.

The issues in this case arise from a malpractice suit filed in Cherokee County, Kansas, on July 16, 1987, by Jessica M. Simon, a minor, and her mother, Hattie Fillenwarth, both of whom are joined as defendants in this case. The suit was based primarily upon Dr. Bazzano's alleged failure to run laboratory tests and correctly diagnose and treat 3-month-old Jessica on March 28, 1986, which resulted in the child having temporary and per-

manent disability. Dr. Bazzano was first notified of the potential claim for malpractice by the attorneys for Simon and Fillenwarth on June 5, 1987.

On November 3, 1988, Commissioner Bell filed a petition in Shawnee County District Court for declaratory judgment against Dr. Bazzano, Simon, and Fillenwarth, contending that Dr. Bazzano had no excess liability coverage from the Fund from April 1, 1986, to July 16, 1987, "because he did not maintain professional liability insurance coverage as required by the Health Care Provider Insurance Availability Act." Dr. Bazzano denied the allegation in his answer, filed December 6, 1988, and in addition asserted the affirmative defenses of waiver and estoppel. On April 3, 1989, Dr. Bazzano and the defendants Simon and Fillenwarth filed separate motions for summary judgment asserting there was excess liability coverage. On April 4, 1989, the plaintiffs filed a counter motion for summary judgment asserting the Fund had no liability.

On May 10, 1989, the district court granted Dr. Bazzano's motion for summary judgment and denied the motion filed by plaintiffs. The court held that PMIC's issuance of an occurrence policy rather than a claims made policy did not relieve the Fund of liability under *Missouri Medical Ins. Co. v. Wong*, 234 Kan. 811, 676 P.2d 113 (1984). In *Wong*, the court held that under the Act a medical malpractice "policy which insures a health care provider practicing in Kansas must be construed to provide claims made coverage, notwithstanding the policy, as written, is an occurrence form policy." Syl. ¶ 3. The court here also found that the Fund was not relieved of liability because the Fund's coverage continues when basic coverage continues, and the basic coverage continued by operation of law due to the insurer's failure to give a cancellation notice to the Commissioner (K.S.A. 40-3402). The plaintiffs have appealed. Plaintiffs state the issue on appeal as being whether "[t]he court erred in granting defendants' motions for summary judgment and denying plaintiffs' motion for summary judgment since Dr. Bazzano did not have the mandatory professional liability insurance required by the Health Care Stablization Act [*sic*], K.S.A. 40-3401, *et seq.*" The resolution of this issue involves the following:

a) Whether defendant Dr. Bazzano had basic coverage as required under the Act when the parties' malpractice claim was made.

b) If basic coverage existed, whether Dr. Bazzano's failure to pay the annual premium surcharge relieves the Fund of liability.

c) Whether plaintiffs are estopped from asserting Dr. Bazzano's noncompliance with the surcharge payment requirements.

The issue and arguments raised by the plaintiffs require the interpretation and application of certain provisions of the Act. Before addressing the arguments asserted, we deem it appropriate to reiterate certain general principles applicable to statutory construction.

"The fundamental rule of statutory construction is that the purpose and intent of the legislature governs when the intent can be ascertained from the statute. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible." *Harris Enterprises, Inc. v. Moore*, 241 Kan. 59, Syl. ¶ 1, 734 P.2d 1083 (1987).

"In determining legislative intent, courts are not bound to an examination of the language alone but may properly look into the causes which impel the statute's adoption, the objective sought to be attained, the statute's historical background and the effect the statute may have under the various constructions suggested." *In re Petition of City of Moran*, 238 Kan. 513, Syl. ¶ 2, 713 P.2d 451 (1986).

"When a statute is plain and unambiguous the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Randall v. Seemann*, 228 Kan. 395, Syl. ¶ 1, 613 P.2d 1376 (1980).

"Interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature." *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984).

The plaintiffs first contend that Dr. Bazzano is not covered by the Fund because he had no basic coverage pursuant to the Act at the time the claim was made on June 5, 1987. It appears to be conceded that Dr. Bazzano had basic coverage during the PMIC policy period from April 1, 1985, to April 1, 1986. Even though the policy issued was an "occurrence" policy rather than

a "claims made" policy as specified by K.S.A. 40-3402(a), the Act provides that the policy is deemed and construed to include the statutory basic coverage. In the instant case the alleged malpractice occurred March 28, 1986, at a time when all parties agree Dr. Bazzano had the required basic coverage under the PMIC policy.

The statutes pertinent to basic coverage begin with K.S.A. 40-3401(b), which provides:

"(b) 'Basic coverage' means a policy of professional liability insurance required to be maintained by each health care provider pursuant to the provisions of subsection (a) or (b) of K.S.A. 40-3402 and amendments thereto."

### K.S.A. 40-3402 provides in part:

"(a) A policy of professional liability insurance approved by the commissioner and issued by an insurer duly authorized to transact business in this state in which the limit of the insurer's liability is not less than $200,000 per occurrence, subject to not less than a $600,000 annual aggregate *for all claims made during the policy period, shall be maintained in effect by each resident health care provider as a condition to rendering professional service as a health care provider in this state, unless such health care provider is a self-insurer. Such policy shall provide as a minimum coverage for claims made during the term of the policy which were incurred during the term of such policy or during the prior term of a similar policy. . . .*

"(1) Each insurer providing basic coverage shall within 30 days after the premium for the basic coverage is received by the insurer or within 30 days from the effective date of this act, whichever is later, notify the commissioner that such coverage is or will be in effect. Such notification shall be on a form approved by the commissioner and shall include information identifying the professional liability policy issued or to be issued, the name and address of all health care providers covered by the policy, the amount of the annual premium, the inception and expiration dates of the coverage and such other information as the commissioner shall require. A copy of the notice required by this subsection shall be furnished the named insured.

"(2) *In the event of termination of basic coverage* by cancellation, non-renewal, expiration or otherwise by either the insurer or named insured, *notice of such termination shall be furnished by the insurer to the commissioner, the state agency which licenses, registers or certifies the named insured and the named insured.* Such notice shall be provided no less than 30 days prior to the effective date of any termination initiated by the insurer or within 10 days after the date coverage is terminated at the request of the named insured and shall include the name and address of the health care provider or providers for whom basic coverage is terminated and the date basic coverage will cease to be in effect. *No basic coverage shall be*

*terminated by cancellation or failure to renew by the insurer unless such insurer provides a notice of termination as required by this subsection.*

"(3) Any professional liability insurance policy issued, delivered or in effect in this state on and after the effective date of this act shall contain or be endorsed to provide basic coverage as required by subsection (a) of this section. *Notwithstanding any omitted or inconsistent language, any contract of professional liability insurance shall be construed to obligate the insurer to meet all the mandatory requirements and obligations of this act.* The liability of an insurer for claims made prior to July 1, 1984, shall not exceed those limits of insurance provided by such policy prior to July 1, 1984.

"(b) *Unless a nonresident health care provider is a self-insurer, such provider shall not render professional service as a health care provider in this state unless such provider maintains coverage in effect as prescribed by subsection (a), except such coverage may be provided by a nonadmitted insurer who has filed the form required [in] subsection (b)(1).*

"(1) Every insurance company authorized to transact business in this state, that is authorized to issue professional liability insurance in any jurisdiction, shall file with the commissioner, as a condition of its continued transaction of business within this state, a form prescribed by the commissioner declaring that its professional liability insurance policies, wherever issued, *shall be deemed to provide at least the insurance required by this subsection* when the insured is rendering professional services as a nonresident health care provider in this state. *Any nonadmitted insurer may file such a form.*

"(2) Every nonresident health care provider who is required to maintain basic coverage pursuant to this subsection shall pay the surcharge levied by the commissioner pursuant to subsection (a) of K.S.A. 40-3404 and amendments thereto directly to the commissioner and shall furnish to the commissioner the information required in subsection (a)(1)." (Emphasis added.)

There can be no doubt that Dr. Bazzano had the basic coverage required by the statutes so long as the PMIC policy was in effect. Under K.S.A. 40-3402(a)(3), every professional liability policy issued to a medical care provider "shall be construed to obligate the insurer to meet all the mandatory requirements and obligations of this act." The statute applies to resident and nonresident health care providers as well as to admitted and nonadmitted insurers.

In *Missouri Medical Ins. Co. v. Wong,* 234 Kan. 811, Dr. Wong obtained an occurrence-type liability policy from the plaintiff at a time when the doctor was practicing in both Kansas and Missouri. The plaintiff insurance company had filed the necessary "Non-Admitted Carrier Declaration of Compliance" form with the Commissioner pursuant to K.S.A. 40-3402(b)(1). The court was required to determine whether the occurrence-type policy pro-

vided claims made coverage for alleged acts of medical malpractice which occurred prior to the effective date of the policy. This court held:

"Where a policy of insurance is issued to an insured in compliance with the requirement of a statute, the pertinent provisions of the statute must be read into the policy, and no provisions of the policy in contravention of the statute can be given effect." Syl. ¶ 1.

"Because medical malpractice insurance is compulsory, the terms of the Kansas Health Care Provider Insurance Availability Act (K.S.A. 40-3401 *et seq.*), become a part of any contract of professional liability insurance which insures a health care provider practicing in Kansas, and to the extent that the provisions of the policy contradict the terms of the act, the terms of the act are controlling with respect to the Kansas practice." Syl. ¶ 2.

"Since K.S.A. 40-3402 requires claims made coverage to be provided in a medical malpractice insurance policy, a policy which insures a health care provider practicing in Kansas must be construed to provide claims made coverage, notwithstanding the policy, as written, is an occurrence form policy." Syl. ¶ 3.

In the present case Dr. Bazzano actually had more extensive coverage than the minimum prescribed by the Act, at least during the policy period. He not only had contractual coverage for any alleged acts of negligence which occurred during the policy period, regardless of when the claims might be made, but by statute he also had basic claims made coverage during the policy period. All parties agree that Simon and Fillenwarth are protected to the extent of the PMIC coverage due to the fact that the alleged malpractice occurred during the policy period. However, the Fund contends it is not liable for excess coverage because Dr. Bazzano did not have a valid policy at the time the claim was first made.

Dr. Bazzano admits he failed to comply with the Act in that he did not have a policy during the period of April 1, 1986, through July 1987, but he contends that public policy requires coverage by the Fund. He contends that because the occurrence policy he obtained from PMIC covers the claim made by Simon and Fillenwarth, the Fund is not prejudiced by his failure to have a claims made policy during the April 1, 1986, to July 1987 period. He additionally contends that the basic statutory coverage was in effect when the claim was made in June 1987, by operation of K.S.A. 40-3402(a)(2), because PMIC failed to provide the Com-

missioner notice of the policy's termination. He argues that, because basic coverage continued, the Fund's liability was likewise continued and covers the claim made on June 5, 1987.

The plaintiffs contend that the provisions of K.S.A. 40-3402(a)(2) requiring notice before basic coverage may be terminated applies only to resident health care providers. It appears to be their argument that, because subsection (a) of the statute refers to "each resident health care provider" and subsection (b) refers to a "nonresident health care provider," the sections are mutually exclusive. They then assert that under subsection (b) there is no requirement for a nonresident health care provider or his insurance company to give any notice of termination and there is no provision extending the coverage for failure to give such a notice. We do not agree with such a narrow construction of the statute and do not believe that subsections (a) and (b) can be read in isolation from each other.

K.S.A. 40-3402(b) provides that every nonresident provider, except a self-insurer, shall maintain the coverage prescribed in subsection (a). Subsection (b)(2) requires the nonresident provider to pay a surcharge levied by the Commissioner pursuant to subsection (a) and requires that the information prescribed in subsection (a)(1) be furnished to the Commissioner. It appears obvious that subsections (a) and (b) are inseparably intertwined as parts of one statute and must be read in conjunction with each other and with the provisions of the entire Act.

Commissioner Bell argues that the legislature intended to grant greater protection to resident providers than to nonresident providers, and that upon failure of the insurer to give notice the resident provider will be granted the extended coverage but the nonresident provider will not. In support of this theory, it is contended that the public policy underlying the Act is to assure an adequate supply of competent health care providers in Kansas by making malpractice coverage available to them and that the Act was adopted for the benefit of health care providers. While this is undoubtedly true, it is only a part of the policy behind the Act.

The seminal case addressing the Act is *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 576 P.2d 221 (1978), in which Dr.

Liggett attacked the constitutionality of the Act. In discussing the history of the Act, the court stated:

"The original bill did not require mandatory insurance coverage, nor did it require payment of the surcharge. These provisions were added by the legislature at the behest of Insurance Commissioner Fletcher Bell. *The mandatory coverage provisions, it was alleged,* would provide for the financial stability of the insurance availability program and *would assure all Kansans they would have a source of recovery for damages resulting from malpractice."* (Emphasis added.) 223 Kan. at 611.

In discussing an alleged due process right under one provision of the Act, the court in *Harrison v. Long,* 241 Kan. 174, 734 P.2d 1155 (1987), observed: "It is the public policy of the State to assure an adequate supply of health care providers *and provide protection to patients who may be injured as a result of medical malpractice."* (Emphasis added.) 241 Kan. at 181.

K.S.A. 40-3402(a)(2) requires the insurer to give notice to the Commissioner, the licensing agency, and the insured of the termination of any policy providing basic coverage. An obvious purpose of the notice provision is to protect not only the health care provider and allow time to secure other coverage but also to protect the provider's patients. Under the public policy of Kansas, it would be totally illogical to provide statutory protection to the patients of resident providers and deny the same protection to Kansas patients of nonresident providers who practice in Kansas. It would be equally illogical to provide protection to resident providers and deny the same protection to nonresident providers who are licensed to practice in Kansas but happen to live outside Kansas. Many Kansas health care providers in the Kansas City and other border areas are nonresidents of Kansas and many maintain practices in two or more states. Another obvious purpose of the statute is to provide notice to the Commissioner and the licensing authority of the termination of the policy. Such information is equally necessary for both resident and nonresident providers if the Commissioner and the licensing authority are to properly carry out their administrative duties.

The Health Care Provider Insurance Availability Act was first adopted by the 1976 legislature as S.B. 646 (L. 1976, ch. 231). The bill, as originally drafted, made no distinction between resident and nonresident providers. Commissioner Bell testified in

support of the Act and, in discussing recommended changes in the original bill and the proposed distinctions between what are now subsections (a) and (b) of K.S.A. 40-3402, stated:

"Presently Senate Bill No. 646 does not distinguish between resident and non-resident providers yet many Kansas health care providers are licensed and do perform medical services in other states. Similarly many non-resident health care providers are licensed and do perform medical services in Kansas.

"Since *it appears that non-resident providers should be subject to the same requirements and entitled to the same protection as Kansas providers when performing medical services in this state,* it seems appropriate that Senate Bill No. 646 should so specify.

"On the other hand, the provisions of Senate Bill No. 646 are intended to provide liability protection to Kansas resident providers wherever they may be lawfully providing medical services.

"In other words, *the provisions of Senate Bill No. 646 must apply to both resident and non-resident providers but it cannot be applied equally other than with respect to services performed within this state.* Thus a distinction is necessary and suggestions embodying this distinction are included in the suggested amendments." (Emphasis added.) Attachment A, Amendments to SB 646, Comm. Minutes, Senate Public Health and Welfare Committee (January 28, 1976).

Thus, it appears that at the time the Act was originally adopted Commissioner Bell was urging that any distinctions between subsections (a) and (b) only applied because nonresident providers were not subject to Kansas regulation for services rendered outside Kansas. In all other respects the original intent apparently was that "non-resident providers should be subject to the same requirements and *entitled to the same protection* as Kansas providers when performing medical services in this state." We agree with the Commissioner's original intent and interpretation as expressed to the legislature.

We conclude K.S.A. 40-3402(a)(2) applies equally to resident and nonresident providers and to admitted and nonadmitted insurers. The statute further provides that the basic coverage will not terminate absent the required notice from the insurer. We hold that the basic coverage afforded by the PMIC policy for the period from April 1, 1985, to April 1, 1986, continued to be in force on June 5, 1987, the date the claim was made, because PMIC had provided no notice of termination. This is the identical position asserted by Commissioner Bell's office in a letter to PMIC dated August 26, 1987. We also conclude that, so long as the

basic coverage continued, the excess liability coverage of the Fund continued. The trial court, in reaching the same conclusion, stated, in part:

"8. If the basic coverage can not be cancelled without notice for reasons of public policy, the Court sees no reason why the Fund should not be liable under the same circumstance, although not specifically required by statute. . . .

"9. The Health Care Stablization Fund is established to provide coverage subsequent to the time that the health care provider has qualified for coverage. Since Dr. Bazzano's basic coverage was continued he is entitled to continuous coverage from the Fund. The Court holds that the Fund is liable for the claim of Jessica Simon made in June of 1987, in excess of the basic coverage by PMI.

"10. The Court construes K.S.A. 40-3402(a)(2) to be applicable to all insurance carriers who write medical malpractice insurance policies for health care providers liability within the state of Kansas."

We concur with the trial court's reasoning.

The next argument of the plaintiffs is that, even if the basic coverage was continued for failure of PMIC to give the statutory notice required by K.S.A. 40-3402(a)(2), the Fund should be relieved of liability under the provisions of K.S.A. 40-3403(c).

The statute provides:

"(c) Subject to subsections (d), (e), (f) and (i), the fund shall be liable to pay: (1) Any amount due from a judgment or settlement which is in excess of the basic coverage liability of all liable resident health care providers or resident self-insurers for any personal injury or death arising out of the rendering of or the failure to render professional services within or without this state; (2) any amount due from a judgment or settlement which is in excess of the basic coverage liability of all liable nonresident health care providers or nonresident self-insurers for any such injury or death arising out of the rendering or the failure to render professional services within this state *but in no event shall the fund be obligated for claims against nonresident health care providers or nonresident self-insurers who have not complied with this act* or for claims against nonresident health care providers or nonresident self-insurers that arose outside of this state." (Emphasis added.)

It is contended by the plaintiffs that the failure of Dr. Bazzano to pay a surcharge for the period from April 1986 to July 1987 constitutes a failure to comply with the Act that relieves the Fund of excess liability coverage for the claim made on June 5, 1987. It is undisputed that no surcharge was paid during the period in question. It is asserted that extension of the basic coverage for

failure to give the statutory notice does not satisfy the requirement that the nonresident provider must comply with all provisions of the Act before there can be liability on the Fund. Given the recognized public policy underlying the Act, we think such a rigid construction of the statute is unreasonable and contrary to the overall objectives and purposes of the Act.

It must be presumed that the Commissioner was fully aware that Dr. Bazzano was practicing in Kansas, that he was insured by PMIC, a nonadmitted insurer; and that the statutory surcharge had been paid for many years by Dr. Bazzano through PMIC. The Commissioner must also be presumed to know that Dr. Bazzano continued to be licensed to practice medicine in Kansas subsequent to April 1, 1986, and that no premium surcharge had been received by the Fund for the period commencing April 1, 1986.

K.S.A. 40-3403(c) must be read in harmony with the entire Act. While the legislature imposed more duties on the nonresident provider, nothing indicates the legislature envisioned less protection in the form of coverage or Fund liability when basic coverage continued by operation of law. While it may be true that Dr. Bazzano owes the Fund a surcharge for the period from April 1, 1986, through July 1987, the basic coverage continued by operation of law during this period, and we hold the excess liability coverage of the Fund also continued. To hold otherwise, by a narrow isolated construction of K.S.A. 40-3403(c), would negate the public policy behind the Act as to patients of nonresident providers even though there had been substantial compliance with the Act. No such denial of protection is found for patients of resident providers and the legislative history of the Act discloses no intent by the legislature to adopt such disparate treatment. To the contrary, the purpose and public policy of the Act is to provide protection to all Kansas patients for medical services rendered in Kansas. We hold that the failure of Dr. Bazzano to pay the premium surcharge subsequent to April 1, 1986, does not relieve the Fund of excess coverage liability so long as the basic coverage remained in effect.

Subsequent to the filing of briefs in this appeal, the plaintiffs sought and obtained permission to file a supplemental brief to correct certain errors in the original. Plaintiffs' motion stated,

"[N]o new issues or authorities are being presented." However, in their supplemental brief, plaintiffs apparently attempt to raise an issue based upon alleged misrepresentations of Dr. Bazzano as to his residence and the extent of his Kansas practice. The issue is not properly before this court and is of no merit. We have considered all of plaintiffs' arguments, whether or not they are addressed in detail in this opinion, and conclude summary judgment was properly granted.

In view of the decision reached, there is no need to consider the defendants' arguments that the plaintiffs are barred by estoppel.

The judgment is affirmed.