No. 88,366

GEORGE W. MARSHALL, M.D., and KRISTI J. WEISS and MARK G.
WEISS, Individually and as the Natural Parents and Next Friends
of JOSEPH C. WEISS, *Appellees,* v. KANSAS MEDICAL MUTUAL
INSURANCE COMPANY, *Appellant.*

(73 P.3d 120)

Opinion filed July 18, 2003.

*Curtis O. Roggow*, of Sanders Conkright & Warren, LLP, of Kansas City, Missouri, argued the cause, and *Roger W. Warren*, of the same firm, was with him on the briefs for appellant.

*Victor A. Bergman*, of Shamberg, Johnson & Bergman, Chtd., of Kansas City, Missouri, argued the cause, and *Anne E. Popper*, of the same firm, and *Michael D. Strohbehn* and *Kip D. Richards*, of Walters, Bender, Strohbehn & Vaughn, P.C., of Kansas City, Missouri, were with him on the brief for appellees.

*Steve A. Schwarm*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, was on the brief for *amicus curiae* Kansas Health Care Stabilization Fund.

The opinion of the court was delivered by

GERNON, J.: This appeal by the Kansas Medical Mutual Insurance Company (KaMMCO) challenges the district court's interpretation of a professional liability (medical malpractice) insurance policy.

Collateral issues involve: (1) Interpretation of the Kansas Health Care Provider Insurance Act (HCPIA), K.S.A. 40-3401 *et seq*.; (2) whether the excess limits liability coverage here violates public policy; (3) whether the insurance policy was ambiguous; and (4)

whether it was permissible for the district court to reform the insurance policy, given the facts in the record.

This case was transferred to this court pursuant to K.S.A. 20-3018(c).

In November 1997, Dr. George W. Marshall delivered a baby who has irreversible damage to his brain and central nervous system. The child's parents are Kristi J. Weiss and Mark G. Weiss. In October 1998, the Weisses' attorney requested copies of Dr. Marshall's medical records regarding Kristi Weiss. The Weisses sued Dr. Marshall in August 1999, alleging negligence.

Dr. Marshall was insured by KaMMCO at the time the Weisses' lawsuit was filed and had been insured by KaMMCO since 1989. In 1999, Dr. Marshall carried professional liability coverage of $200,000 per claim, with a $600,000 aggregate as required by the HCPIA. See K.S.A. 40-3402(a). Dr. Marshall also carried separate liability coverage from the Kansas Health Care Stabilization Fund (Fund) in the amount of $800,000 per claim and $2,400,000 annual aggregate. See K.S.A. 2002 Supp. 40-3403(a) and (l)(3).

In December 1998, after receiving the Weisses' records request, Dr. Marshall applied to KaMMCO for an excess limits endorsement to his policy in the amount of $1,000,000 per claim and $1,000,000 annual aggregate. According to its terms, this coverage applied after the limits of his basic liability coverage and his additional Fund coverage were exhausted. Dr. Marshall then demanded that KaMMCO provide the $1,000,000 excess limits coverage for the Weisses' litigation. KaMMCO denied coverage on the excess limits liability endorsement, contending that the alleged negligence in the Weisses' lawsuit predated the retroactive date and there was no retroactive coverage.

Dr. Marshall filed a declaratory judgment action to force KaMMCO to pay the excess limits coverage. Agreeing with Dr. Marshall's position, the Weisses intervened. All parties stipulated that there were no material facts at issue, and each party filed a motion for summary judgment. KaMMCO appealed after the trial court granted the motions for summary judgment on behalf of Dr. Marshall and the Weisses.

*(1) Does Kansas Law Mandate Claims Made Coverage for Excess Limits Insurance?*

Dr. Marshall and the Weisses argue that the HCPIA includes excess limits coverage in the mandatory coverage language of K.S.A. 40-3402(a). KaMMCO, not surprisingly, argues that the statute does not mandate such coverage.

Our first task, therefore, is to examine the statutory scheme of the HCPIA. The interpretation of a statute is a question of law over which this court has de novo review. See *Bell v. Simon*, 246 Kan. 473, 476, 790 P.2d 925 (1990).

When construing a statute, the court must give the statute the effect intended by the legislature. The legislative intent is to be determined from considering the entire act and every part thereof. If the statute is plain and unambiguous, the court must give effect to the language of the statute as written by the legislature. Courts, however, are not limited to examining the language of the statute alone. Courts may also consider the causes that impel the statute's adoption, the statute's objective, its historical background, and the effect of the statute under various constructions. *Bell*, 246 Kan. at 476.

K.S.A. 40-3402(a) provides:

"A policy of professional liability insurance approved by the commissioner and issued by an insurer duly authorized to transact business in this state in which the limit of the insurer's liability is not less than $200,000 per claim, subject to not less than a $600,000 annual aggregate for all claims made during the policy period, shall be maintained in effect by each resident health care provider as a condition to rendering professional service as a health care provider in this state, unless such health care provider is a self-insurer. . . . *Such policy shall provide as a minimum coverage for claims made during* the term of the policy which were incurred during the term of *such policy or* during *the prior term of a similar policy.*" (Emphasis added.)

It is useful to distinguish the common types of liability insurance available for health care providers. With an occurrence policy, the coverage becomes effective if the negligent or omitted act occurs during the term of the policy. Essentially, the peril insured against by an occurrence policy is the act or omission itself, regardless of when the claim against the policy is made. With a claims made

policy, the coverage becomes effective if the claim is discovered or made during the effective term of the policy, so the peril insured against is the claim itself. In a pure claims made policy, the effectiveness of the policy is not dependant on when the negligent act or omission occurred.

KaMMCO agrees that K.S.A. 40-3402(a) requires health care providers to maintain a claims made liability policy but argues that the statute only applies to its basic coverage and not to its excess limits coverage.

The relevant language of K.S.A. 40-3402(a), which has been a part of the statute since it was first enacted in 1976, states: "Such policy shall provide *as a minimum coverage for claims made during the term of the policy which were incurred during the term of such policy or* during the *prior term of a similar policy*." (Emphasis added.)

When the statute was first enacted in 1976, there was no need for excess limits insurance because the Fund's liability was unlimited. Therefore, excess limits insurance was not contemplated by the legislature; since the relevant language in K.S.A. 40-3402(a) has gone unchanged, we conclude that no excess limits liability coverage should be read into the statute.

Furthermore, the plain language of K.S.A. 40-3402(a) refers to the claims made policy as a "minimum coverage" and not as "any and all" coverage. If the legislature had intended for insurers to provide any and all professional liability insurance with claims made policies, the legislature would have used the words "any and all" rather than "minimum coverage."

KaMMCO's argument that the HCPIA applies only to its basic liability coverage is further supported by K.S.A. 2002 Supp. 40-3401(a), which defines "basic coverage" as "a policy of professional liability insurance required to be maintained by each health care provider pursuant to the provisions of subsection (a) or (b) of K.S.A. 40-3402 and amendments thereto." Thus, by definition, K.S.A. 40-3402(a) establishes the minimum "basic coverage" and does not address excess limits insurance. Although the HCPIA refers to "basic coverage" in several statutes, see K.S.A. 2002 Supp. 40-3401, K.S.A. 40-3402, K.S.A. 2002 Supp. 40-3403, K.S.A. 2002

Supp. 40-3404, K.S.A. 40-3413, K.S.A. 2002 Supp. 40-3414, K.S.A. 40-3420, the Act neither requires excess limits coverage nor prohibits insurers from offering excess limits liability insurance.

Focusing on the language in K.S.A. 40-3402 that refers to claims incurred "during the prior term of a similar policy," Dr. Marshall and the Weisses argue that the excess limits insurance must be pure claims made insurance because Dr. Marshall's alleged negligence occurred during the prior term of a similar policy. The word "similar" means "[n]early corresponding; resembling in many respects." Black's Law Dictionary 1383 (6th ed. 1990). Although both the statutory basic coverage (primary) and excess limits coverage (secondary) are similar in that they both provide professional liability insurance, the similarities end at that point.

In any review of insurance coverages, we must always be guided by the language of the insurance contract. Here, by the terms of KaMMCO's insurance contract, the basic coverage and the excess limits coverage do not apply at the same time or under the same circumstances. Thus, the coverages are not similar, and the statutory requirement of claims made minimum liability coverage in K.S.A. 40-3402 does not extend to excess limits coverage.

Dr. Marshall and the Weisses' reliance on *Missouri Medical Ins. Co. v. Wong*, 234 Kan. 811, 676 P.2d 113 (1984), is misplaced. Dr. Wong did not have excess limits coverage; his primary coverage limit was $1,000,000 per claim, with a $1,000,000 annual aggregate. K.S.A. 40-3408 requires the payment of all insurance amounts that would have been applicable in the absence of the HCPIA before the Fund coverage becomes effective. Because Dr. Wong only purchased a policy with one coverage limit rather than purchasing a policy with both basic and excess limits liability coverages, K.S.A. 40-3408 applied, making the entire $1,000,000 coverage applicable before the Fund coverage became effective.

K.S.A. 40-3408 does not apply to Dr. Marshall's excess limits insurance. Dr. Marshall did not purchase $1,000,000 of primary insurance like Dr. Wong. Instead, Dr. Marshall purchased a basic liability policy with coverage limits as required by K.S.A. 40-3402 and an additional endorsement for excess limits coverage which, according to the terms of the insurance contract, applied only after

the Fund coverage was exhausted. K.S.A. 40-3408 applies only to coverage that would have been paid in the absence of the HCPIA prior to any Fund coverage. Dr. Marshall's excess limits coverage was not effective until after the Fund limits were paid.

We, therefore, conclude that the trial court erred when it found that K.S.A. 40-3402 requires the excess limits coverage to be issued as a pure claims made policy without the limitation of a retroactive period.

(2) *Does KaMMCO's Excess Limits Coverage Violate Public Policy?*

Properly framed, this issue is whether the KaMMCO policy violated public policy if the excess limits coverage did not apply to professional services rendered before January 1, 1999.

The trial court did not rule on the public policy issue, though both parties raised it. Since our standard of review is de novo, we will consider the issue. See *Bolz v. State Farm Mut. Auto. Ins. Co.*, 274 Kan. 420, 423, 52 P.3d 898 (2002).

"Public policy consists of the 'principles and standards regarded by the legislature or by the courts as being of fundamental concern to the state and the whole of society.' Black's Law Dictionary 1245 (7th ed. 1999). The declaration of public policy is primarily a legislative function. [Citation omitted.] Where the legislature declares the public policy and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for the legislature and not for the courts. [Citations omitted.]" *Bolz*, 274 Kan. at 424.

The issue is a matter of first impression in Kansas. Both parties cite to cases from other jurisdictions. Although none of the cited cases are directly on point, they are instructive in resolving the public policy question.

KaMMCO summarily cites *Truck Ins. Exchange v. Ashland Oil, Inc.*, 951 F.2d 787 (7th Cir. 1992); *Gaston Memorial Hosp. v. Virginia Ins. Reciprocal*, 80 F. Supp. 2d 549 (W.D. N.C. 1999); *Travelers Indemnity Co. v. Mutual Ins. Co.*, 152 Ariz. 267, 731 P.2d 632 (1986); *Merrill & Seeley, Inc. v. Admiral Ins. Co.*, 225 Cal. App. 3d 624, 275 Cal. Rptr. 280 (1990); *General Insur. Co. v. R. B. McManus, Inc.*, 272 Ill. App. 3d 510, 650 N.E.2d 1080 (1995); *Stine v. Continental Casualty Co.*, 419 Mich. 89, 97-99, 349

N.W.2d 127 (1984); *N.K.K. by Knudson v. St. Paul Fire & Marine Ins.*, 555 N.W.2d 21 (Minn. App. 1996); *Gereboff v. Home Indemnity Co.*, 119 R.I. 814, 383 A.2d 1024 (1978), for the proposition that claims made policies with limited retroactivity are not against public policy. KaMMCO does not analyze the difference between the facts of this case and the facts of each of those cases. KaMMCO cites these cases as the majority view and asserts that *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406 (1985), cited by Dr. Marshall and the Weisses, is the minority view.

Dr. Marshall and the Weisses, on the other hand, rely solely on *Sparks* for the proposition that claims made policies with limited retroactivity are void as against public policy. They acknowledge that the *Sparks* case is a minority viewpoint but assert that the *Wong* decision aligns Kansas with the minority viewpoint.

Both parties oversimplify their analyses of the cases from other jurisdictions and ignore other decisions. The cases cited do not establish the majority and minority opinions as suggested by the parties. Instead, those courts issued opinions based upon the unique factual situation presented in each case. Those conclusions, however, are not readily assimilated into two categories based on the final conclusions. A more detailed analysis is necessary to apply the results in those cases to new factual situations like the one in this case.

In resolving this issue, we must consider (1) the concept of insurance coverage that is simultaneous with the insured's legal liability, (2) the freedom to contract, and (3) prevention of fraud.

In *Sparks*, the New Jersey Supreme Court interpreted a claims made professional liability policy to be an occurrence policy because the limited retroactivity of the claims made coverage did not comport with the insured's reasonable expectations. 100 N.J. at 338-39. Interestingly, the insurer did not deny coverage because the alleged negligence occurred after the retroactive date specified in the policy. Instead, the insurer denied coverage because the insured did not notify the insurer of the claim until after the policy had expired. Focusing on the public policy of simultaneous liability coverage, the *Sparks* court ignored the fact that simultaneous coverage was not at issue. 100 N.J. at 332. The *Sparks* court, however,

noted that claims made policies with limited retroactive coverage may be appropriate when "offered at a reduced premium to the professional in his very first year of practice, or to the professional who changes from 'occurrence' to 'claims made' protection." 100 N.J. at 340 n.4.

The New Jersey Supreme Court decided *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395 (1985), at the same time it decided *Sparks*. However, in *Zuckerman*, the court enforced the claims made policy as written because the insured had failed to notify the insurer of the claim during the term of the policy. 100 N.J. at 321-22. The difference between *Sparks* and *Zuckerman* was the retroactivity of the policy. In *Zuckerman*, the policy's retroactivity was limited only by claims that the insured should have reasonably known about when the policy was issued. Instead of looking at the policy for simultaneous liability coverage, the *Zuckerman* court focused on the parties' freedom to contract, stating that the "extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, *gratis*, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." 100 N.J. at 324.

In *Merrill & Seeley, Inc.*, *General Insur. Co.*, *N.K.K.*, and *Gereboff*, the validity of the retroactive date was at issue because the alleged negligence occurred prior to the retroactive date. In upholding the limitation that retroactive dates impose on claims made policies, these courts focused on the insured's choices in purchasing insurance contracts rather than the insured's reasonable expectation of coverage. *Merrill & Seeley, Inc.*, 225 Cal. App. 3d at 630; *General Insur. Co.*, 272 Ill. App. 3d at 515; *N.K.K.*, 555 N.W.2d at 26; *Gereboff*, 119 R.I. at 821-22. Finding the insurance policies unambiguous, two of the courts enforced them as written and refused to address the insured's reasonable expectations. *Merrill & Seeley, Inc.*, 225 Cal. App. 3d at 630; *General Insur. Co.*, 272 Ill. App. 3d at 513-14. The other two courts specifically found that the insured knowingly purchased insurance with limited retroactivity and refused to reform the unambiguous policies. *N.K.K.*, 555 N.W.2d at 26; *Gereboff*, 119 R.I. at 822.

In *Brander v. Nabors*, 443 F. Supp. 764 (N.D. Miss. 1978), and *Stine*, 419 Mich. 89, the courts were not concerned with the application of the retroactive date. Instead, the insurers denied coverage because the insureds failed to assert a claim during the policy period. Noting the parties' right to freely contract, these courts refused to find the insurance policies ambiguous simply because they were hybrid policies rather than pure claims made or occurrence policies. *Brander*, 443 F. Supp. at 769-70; *Stine*, 419 Mich. at 114-16. The *Brander* court also noted that the freedom of insurance companies to offer hybrid policies serves the public interest because it deters insurance fraud. Without limited retroactivity, an insurer cannot protect itself from insureds who purchase insurance to cover a known claim while concealing the possibility of the claim from the insurer. *Brander*, 443 F. Supp. at 773.

In *Truck Ins. Exchange*, 951 F.2d 787, the insured purchased a claims made policy without the limitation of a retroactive date. The issue was whether the insured had knowledge of any circumstances that might lead to a claim at the effective date of the policy. Focusing on the possibility of fraud, the *Truck* court upheld the claims made policy, finding that the insured knew about the possible claim on the effective date of the policy. 951 F.2d at 791. The *Truck* court stated: "The language to which [the insured] objects merely protects the insurer against the form of fraud that consists of taking out claims-made insurance after you know or should know that a claim is about to be made against you." 951 F.2d at 791.

Two of the cases cited by both parties do not address the public policy concerns with claims made policies that have limited retroactivity. See *Gaston Memorial Hosp.*, 80 F. Supp. 2d 549; *Travelers Indemnity Co.*, 152 Ariz. 267. Both of these courts denied coverage because the alleged negligence occurred prior to the retroactive date in the claims made policies without addressing the merits of retroactive coverage. *Gaston Memorial Hosp.*, 80 F. Supp. 2d at 557; *Travelers Indemnity Co.*, 152 Ariz. at 268. Although these cases are not helpful for analyzing public policy concerns, they demonstrate other courts' willingness to accept claims made insurance with limitations on the retroactive coverage.

### (a) Simultaneous Coverage

We conclude that by enacting the HCPIA, the Kansas Legislature has clearly established that Kansas public policy favors simultaneous coverage and liability. Indeed, the Kansas Legislature has already addressed this public policy by requiring basic liability insurance for all licensed health care providers. See K.S.A. 40-3402; K.S.A. 2002 Supp. 40-3403. The issue here is not whether Dr. Marshall had any insurance at all; he did. The issue is whether the excess limits liability coverage applies retroactively without limitation, notwithstanding the policy endorsement. Thus, the public policy of simultaneous coverage is not violated under the facts of this case.

### (b) Freedom to Contract

Kansas recognizes the freedom to contract as a qualified and not an absolute right that is protected by the Fifth and Fourteenth Amendments to the United States Constitution. *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 28, 643 P.2d 87 (1982). Freedom to contract, however, is limited by other public policy and legislation. 231 Kan. at 28. Nevertheless, "the paramount public policy is that freedom to contract is not to be interfered with lightly. [Citation omitted.]" *Foltz v. Struxness*, 168 Kan. 714, 721-22, 215 P.2d 133 (1950).

Dr. Marshall and the Weisses argue that Dr. Marshall did not freely contract with KaMMCO for the excess liability insurance because no one from KaMMCO spoke with Dr. Marshall about the policy before he purchased it. This argument, however, overlooks Dr. Marshall's choice to delegate the purchase of the policy to his secretary. In fact, the record on appeal discloses that Dr. Marshall did not read all of the application for the excess limits liability coverage before signing his name to the application. As a result, Dr. Marshall did not notice that the retroactive date on the application was left blank. In the disclosure statement before the signature line, the application specifically states: "As defined in the policy, claims made coverage provides coverage for claims occurring subsequent to the retroactive date and first made to the company during the policy period." Had Dr. Marshall read the excess

limits application before signing it, perhaps he would have understood the need to specify a retroactive date on the application.

The record also discloses that Dr. Marshall never read the Medical Professional Liability Excess Limits Insuring Agreement (endorsement) that was attached to the application until the initiation of this litigation. The endorsement clearly explains the limitations of the excess limits coverage being added to the policy. A party to a contract has a duty to learn the contents of a written contract before signing it. *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 299, 736 P.2d 888 (1987). This duty has been interpreted to include a duty to secure a reading and explanation of the contract. 241 Kan. at 299. A party's negligent failure to do so estops the party from avoiding the terms of the contract on the grounds of ignorance of its contents. 241 Kan. at 299.

Accordingly, Dr. Marshall cannot avoid the terms of the excess limits coverage because he was ignorant about the limitations of the policy endorsement. Likewise, he cannot claim that the excess limits insurance violates his freedom to contract because he failed to adequately inform himself before entering into the contract.

The statutorily required minimum limits of professional liability coverage, as is evident from the facts of this case, are not necessarily sufficient to cover all of a health care provider's liability. To provide additional protection for Kansas residents and health care professionals, insurance companies should be free to contract for additional coverage, with premiums determined in accordance with the parties' needs and consistent with the risk factors disclosed to the insurance companies. Public policy supports this freedom to contract without unduly burdening either party to the transaction. Without this freedom to contract, it is likely that insurance companies might refuse to assume additional risk on behalf of health care providers.

The facts of this case are very similar to those in *Merrill & Seeley, Inc.*; *General Insur. Co.*; *N.K.K.*; and *Gereboff*, where the courts upheld the limited retroactivity of claims made insurance polices. The key difference between those cases and the case here is that those cases involved the only insurance available to the insured. In this case, the only insurance at issue is the $1,000,000 excess limits

coverage over and above the statutorily required $1,000,000 of coverage already available from KaMMCO and the Fund. This distinction further supports the affirmation of KaMMCO's excess limits insurance under the public policy of freedom to contract.

### (c) Fraud

Preventing insurance fraud positively affects the citizens of Kansas by making excess liability insurance available at a reasonable cost. If insurers are forced to sell excess limits coverage on a purely claims made basis with unlimited retroactivity, either the cost of such insurance will skyrocket or the insurers will discontinue offering excess coverage because it would become impossible to assess the exposure of the insurer.

The ramifications of possible insurance fraud are evident under the stipulated, uncontroverted facts of this case. Dr. Marshall admitted that he had never applied for excess limits insurance prior to December 1998. Dr. Marshall paid $3,017 for $1,000,000 in excess limits insurance coverage in December 1998. Dr. Marshall also paid $30,322 in December 1998 for his primary limits coverage of $1,000,000 from KaMMCO and the Fund. Before Dr. Marshall applied for excess limits insurance, the Weiss' attorney requested medical records from Dr. Marshall. Dr. Marshall did not purchase or attempt to purchase excess limits coverage when he renewed his primary insurance with KaMMCO for the calendar year 2000.

The factual situation presented in this case is precisely the factual situation the *Truck* court warned about. See *Truck Ins. Exchange*, 951 F.2d at 791. Dr. Marshall purchased the claims made excess limits coverage after he knew that a claim would be made against him. Although Dr. Marshall and the Weisses argue that KaMMCO was aware of a possible claim from the Weisses before the excess limits coverage was issued, KaMMCO was not concerned about the possibility of the Weiss' claim because the retroactive date excluded coverage for any claim that might be made.

While there is no suggestion of an overt attempt to defraud KaMMCO in this case, the public policy considerations of insurance fraud may be considered, given the record on appeal. After

evaluating all of the public policy considerations implicated in this case, we hold that it is not against public policy for KaMMCO to offer excess limits insurance on a claims made basis with limited retroactivity. Indeed, public policy supports the availability of such insurance to health care providers.

### (3) *Is KaMMCO's Excess Limits Endorsement Ambiguous?*

The interpretation of an insurance contract is a question of law over which an appellate court has de novo review. The appellate court is not bound by the district court's interpretation. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998).

KaMMCO contends that the trial court erred when it found that the KaMMCO policy was ambiguous and should be construed as Dr. Marshall has contended.

We agree with KaMMCO and reverse.

If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used. *Bugg*, 265 Kan. at 694. An insurance policy is ambiguous when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language. *Jones v. Reliable Security, Inc.*, 29 Kan. App. 2d 617, 626-27, 28 P.3d 1051, *rev. denied* 272 Kan. 1418 (2001). An ambiguity does not exist merely because the parties disagree on the interpretation of the language. 29 Kan. App. 2d at 627.

To determine whether an insurance contract is ambiguous, the court must not consider what the insurer intends the language to mean. Instead, the court must view the language as to what a reasonably prudent insured would understand the language to mean. *Bugg*, 265 Kan. at 694. This does not mean that the policy should be construed according to the insured's uninformed expectations of the policy's coverage. *Jones*, 29 Kan. App. 2d at 627.

Courts should not strain to find an ambiguity when common sense shows there is none. *Bugg*, 265 Kan. at 694. The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements. 265 Kan. at 697.

As a general rule, exceptions, limitations, and exclusions to insurance policies are narrowly construed. The insurer assumes the duty to define limitations to an insured's coverage in clear and explicit terms. To restrict or limit coverage, an insurer must use clear and unambiguous language. Otherwise, the insurance policy will be construed in favor of the insured. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998).

Although the trial court found the excess limits endorsement to be ambiguous, its opinion does not address the precise ambiguity in the policy's language. Instead, the trial court's conclusion reiterates its conclusion regarding the application of K.S.A. 40-3402. The court stated:

"When the Court looked at the document in total, the Court came away with the same conclusion as advanced by Dr. Marshall's counsel, and that is, how do we have a policy that complies with the statute, if in fact [its] retroactive date is the same date as the date of [its] effective date. It just simply doesn't compute."

Nevertheless, this court can interpret the insurance policy without regard to the trial court's interpretation. See *Bugg*, 265 Kan. at 694.

The pertinent part of the policy endorsement states:

"MEDICAL PROFESSIONAL LIABILITY
EXCESS LIMITS
INSURING AGREEMENT
"Coverage

"This Endorsement extends the coverage afforded by the policy to cover claims arising from the performance of professional services, as defined in the policy, subsequent to the excess limits retroactive date as set forth in the Excess Limits Endorsement attached to the policy, and first made against the named insured while this Agreement is in force. All coverages, exclusions, terms, conditions, rights, duties and obligations contained in the policy shall apply with equal force to this Agreement unless specifically modified by this Agreement.

"Limits of Liability

"The coverage afforded by this Endorsement shall attach after the coverages and policy limits of all other policies for claims arising from the performance of professional services, including coverage extended by the Kansas Health Care Stabilization Fund, have been exhausted. The limits of liability, which are in excess of all other insurance as stated above, shall be those limits described in the Excess Limits Endorsement. Said limits of liability shall be available only for claims first

made against the named insured during the policy period and occurring subsequent to the excess limits retroactive date, as set forth in the Declarations Page and Excess Limits Endorsement."

The "Excess Limits Endorsement" declarations page specifically provides:

| "HEALTH CARE PROVIDER | EFFECTIVE DATE | EXCESS LIMITS RETROACTIVE DATE | EXCESS LIMITS EACH CLAIM/ANNUAG AGGREGATE |
|---|---|---|---|
| MARSHALL, MD, GEORGE W | 01/01/99 | 01/01/99 | 1,000,000 1,000,000." |

KaMMCO argues that the exclusions in the primary policy are included in the excess limits endorsement because they are incorporated by reference in the endorsement and do not conflict with the language in the endorsement. KaMMCO, however, misconstrues the language in the primary policy. By its very terms, the exclusions listed in the primary policy apply only to "Coverage A" and "Coverage B." The declarations page of the primary policy clearly identifies the excess limits liability coverage as "Coverage C."

Dr. Marshall and the Weisses argue that the entire policy is ambiguous for two reasons. First, the excess limits endorsement references two retroactive dates, July 6, 1977, and January 1, 1999. Second, the phrase, "subsequent to the retroactive date" in the "Coverage A" clause of the primary policy modifies "services" or "claim," thereby referring to the timing of the claim. Both of these arguments are in error.

The excess limits endorsement clearly states that the excess liability limits are "available only for claims first made against the named insured during the policy period and occurring subsequent to the excess limits retroactive date, as set forth in the *Declarations Page and Excess Limits Endorsement*." (Emphasis added.) The fact that the retroactive dates listed in the primary policy and in the excess limits endorsement are different does not make the policy ambiguous because they are joined by the conjunction "and" rather than "or." The use of the word "and" eliminates any doubtful or conflicting meaning. It is not confusing to determine whether an event occurs after the two different dates.

Dr. Marshall and the Weisses' second argument fails because the "Coverage A" clause in the primary policy does not apply to the excess limits coverage, which is designated as "Coverage C." Even if the clause applied, the appellees have misconstrued the language. The "Coverage A" clause in question states:

"To pay on behalf of the Insured or the Insured's estate all sums which the Insured shall become legally obligated to pay as damages because of any claim or claims first made against the Insured during the policy period arising out of the performance of professional services rendered or which should have been rendered, *subsequent to the retroactive date*, by the Insured . . . ." (Emphasis added.)

The phrase "subsequent to the retroactive date" modifies "rendered" and describes when the professional services had to occur before the coverage would apply.

When construed as a whole, the insurance policy is not ambiguous. The language clearly establishes that the excess limits coverage is only available when four conditions are met. Those conditions include: (1) The limits of all other policies must have been paid; (2) the limits of the Fund must have been paid; (3) the claim must be made during the policy period; (4) the professional services must have been performed after the excess limits retroactive date. When viewed in the eyes of a reasonably prudent insured, the policy clearly establishes the excess limits retroactive date on the excess limits endorsement as January 1, 1999. The language is not confusing, contradictory, or hidden amongst the text of the contract. Indeed, the retroactive date for the excess limits coverage appears on a page with little other information. Thus, the trial court erred when it found the insurance policy ambiguous.

As noted by other courts that have considered whether claims made policies with limited retroactive coverage are ambiguous, the fact that a policy cannot be classified as purely claims made or purely occurrence insurance does not in and of itself create an ambiguity. *Brander*, 443 F. Supp. at 769-70; *Merrill & Seeley, Inc.*, 225 Cal. App. 3d at 630; *General Insur. Co.*, 272 Ill. App. 3d at 513-14; *Stine*, 419 Mich. at 114; *N.K.K.*, 555 N.W.2d at 25. The same holds true with the insurance policy in this case. This lack of ambiguity requires us to reverse.

(4) *Did the Trial Court Properly Reform the Insurance Policy?*

The trial court's ruling, which reformed the insurance policy to conform to Dr. Marshall's expectations, was dependent on the court's finding that it was an ambiguous contract.

KaMMCO argues that the trial court erroneously applied the reasonable expectations doctrine to reform the insurance policy.

If a contract is ambiguous, there are two methods that may be used to reform the contract: "(1) A liberal construction in a way most favorable to the insured and (2) an interpretation consistent with the reasonable expectations of the insured." *Liggatt v. Employers Mutual Cas. Co.*, 273 Kan. 915, 925, 46 P.3d 1120 (2002). The doctrine of reasonable expectations, however, only applies when a contract is ambiguous. 273 Kan. at 925. When an insurance contract is not ambiguous, the court will enforce the contract as written. 273 Kan. at 923.

The insurance policy in this case is not ambiguous. Therefore, the doctrine of reasonable expectations does not apply. The trial court erred when it reformed the insurance policy to conform to Dr. Marshall's expectations.

Reversed.

ABBOTT and NUSS, JJ., not participating.

CHRISTEL E. MARQUARDT, J., and LARSON, S.J., assigned. ▌