The opinion of the court was delivered by
Beier, J.:
This appeal addresses whether a Mutual of Omaha Insurance Company policy issued to the Kansas State High School Activities Association provided coverage for catastrophic personal injury suffered by 10th grader Jesus Rodriguez.
We hold that coverage exists. We therefore reverse contraiy rulings by the district court judge and a panel of our Court of Appeals, and we remand the case to the district court for further proceedings.
*135 Factual and Procedural Background
The accident that injured Rodriguez occurred on August 29, 2006, while he was traveling to his first match of the Sumner Academy soccer season. Rodriguez was riding in the bed of a pickup truck driven by fellow student and teammate Mike Hitze when the pickup collided with another car. Rodriguez was thrown from the pickup and sustained the injury that now requires him to have round-the-clock care.
Rodriguez’ mother, Graciela, initially filed this lawsuit on his behalf against the school district, Hitze, and the driver of the car that had collided with Hitze’s truck.
During the course of the lawsuit, plaintiff learned that the Association, which administers various extracurricular activities in the state, had purchased a Mutual of Omaha policy to cover injuries sustained by participants during events the Association sanctioned, as well as during certain types of travel to and from such events. The insurance policy covered
“[sjtudents participating in interscholastic competition or activities under the jurisdiction of the KSHSAA including school-supervised practice, try-outs, pre and post game-related activities including award banquets and covered travel as defined under the policy.”
There is no dispute that the soccer match was a competition that fit this description. The policy defined “covered travel” as
“team or individual travel, for purposes of representing the Participating School, that is to or from the location of a Covered Event and is authorized by the Insured Person’s Participating School, provided the travel is paid for or subject to reimbursement by the Participating School. Covered Travel to a Covered Event will commence upon embarkation from an authorized departure point and terminate upon arrival at the location of the Covered Event.” (Emphasis added.)
Rodriguez filed a claim, and Mutual of Omaha denied it, reasoning that the travel during which Rodriguez was injured did not qualify as covered under the policy. According to Mutual of Omaha, the school had indicated no request for reimbursement for the travel had been made; moreover, the travel was not “subject to reimbursement” because the school also had indicated that it had “been unable to locate any requests for reimbursement, or *136 payment of, expenses incurred by a parent or student using a private vehicle to transport students to a sporting event.” Mutual of Omaha asserted that all expenditures of the school system must be authorized by law, and there was no statutory authorization for a school to pay a private individual for use of a private car to transport a student in Rodriguez’ circumstances.
After the denial of coverage, Mutual of Omaha was added as a defendant in this lawsuit. A bench trial limited to the insurance coverage issue followed.
Rodriguez’ mother testified that Rodriguez’ father had signed a permission form covering travel options for members of the soccer team. The form granted permission for Rodriguez to, among other things, “[r]ide with other players from school to practice, home meets, or to meet the bus for away meets” and to “[rjide to team events with other players.”
Israel Ocanas, one of the other team members who rode with Hitze and Rodriguez on the day of the accident, testified that he was unaware whether the school had provided a bus for team members. He said that no one had directed him to travel by bus. According to Ocanas, it was “normal ... to just catch a ride with whoever was heading that way in a car.” Ocanas testified that, when the campus officer let Hitze’s pickup exit the school parking lot, Rodriguez was sitting in the pickup bed. The group then waited across from the school for other team members to arrive. Eventually a total of three, including Rodriguez, rode in the bed of the pickup.
Much of tire testimony at trial focused on the school district’s policies and administrative guidelines. The administrative guidelines mirror the numbering system of the policies but are amended with an “-A.” As one of the school district’s administrators would testify, the guidelines are not “policy per se. But they’re . .. guidelines that administrators are expected to follow. They help them in making their decisions in order to implement policy correctly.”
The clerk for the Board of Education, Susan Westfahl, testified about a school district administrative guideline, 3.5.5.0.0-A, which was titled “Pupil Transportation.” The guideline included the following passage:
*137 “.3.0 Field Trips, Curricular Activities, Extracurricular Activities Field.Trips and Curricular Activities
“Arrangements for activity transportation shall be made by the Building Administrator using the Field Trip Request procedure.
“When district equipment or drivers are unavailable or when it is economically advantageous to use other means of activity transportation, arrangements for hired or non- district-owned activity transportation shall be made by the building administrator.
[[Image here]]
“.3.1.4 Private Vehicle
“Use of private automobiles for field trips and activity transportation shall not be authorized except in such instances where drivers are fully responsible adults (over 21 years of age). Authorized drivers shall verify insurance coverage in accordance with established Kansas insurance mínimums to the building principal or his designated representative.”
No copy of the guideline in the record on appeal includes a subsection covering extracurricular activities such as soccer matches. Westfahl also testified that, in the 10 years she had worked for the Board, she could not recall an instance in which the Board had approved reimbursement for a student who had transported another student to a school activity.
Testimony of Tom Petz, executive director of human resource services for the school district, was submitted during the bench trial by way of transcribed deposition and exhibits. The exhibits to Petz’ deposition included a school district policy, 3.5.5.0.0, titled “Pupil Transportation.” It stated in part:
“Responsibility for general administration of pupil transportation programs shall be subject to the direction of the Superintendent of Schools with a delegation of responsibility through the Assistant Superintendent for Business Affairs to the Director of Pupil Transportation Services.
“.1.0 Equipment
“Depending upon die demands of services involved, transportation shall be provided with equipment which may be:
• Owned by the school district
• Leased by tire school district and operated by the school district itself
• Contracted with a contract carrier.
“.1.1 Use of Privately-Owned Cars
“.1.1.1 Privately-owned cars shall not be employed by Unified School District #500 of Kansas City in the transportation of pupils to and *138 from schools except as outlined in Policy 3.5.5.2.3 et seq. [dealing with exceptional students].
“.1.1.2 Privately-owned cars driven to and from school shall be subject to such rules and regulations as established by the Board of Education for the control of traffic on or around school grounds as provided by KSA 72-9101.
“.2.0 Service Areas
“.2.1 High Schools and Middle School
“Transportation for high school and middle school pupils will be provided for those pupils living one and one-half (1-½) miles or more from the school by tire nearest commonly traveled route. Bus stops and routes shall be so arranged as to be of maximum convenience and safety and shall be so located that no pupil eligible to be transported shall be required to walk more than .5 (½) miles to the nearest stop.
“.2.1.1 High School Magnet Programs
“A routing plan shall be established to provide transportation for students enrolled in the high school magnet program.
•
Field Trips, Curricular Activities, Extracurricular Activities o
“When appropriate and feasible in tire regular course of instruction, bus transportation may be furnished for field trips, programs and the general instructional program. Transportation shall be furnished to the extent that such transportation can be provided without impairment of the general transportation program and within the limitation of funds budgeted for such transportation.
“.3.1 Field Trips and Curricular Activities
“Any transportation for field trips and curricular activities shall be provided only upon the specific approval of the Superintendent of Schools or his designated agent. Requests for such transportation must be made at such time and in such form as may be required by the Superintendent.
“.3.2 Extracurricular Activities and School Associated Groups
“Transportation shall be provided for various music, athletic and other school associated groups. Arrangements for transportation shall follow the administrative guideline for Pupil Transportation 3.5.5.0.0.-A.
A.O Special Activity Transportation
“Special activity transportation shall be provided for pupils as identified in Board Policy 3.5.5.2.1 and 3.5.5.2.1.1 enrolled at secondary (high schools and middle schools) attendance centers.
“.4.1 After-School Activities
“Administration guidelines shall provide for service to permit participation in activities conducted in a period of not to exceed two and *139 one-lialf (2½) hours after the close of tire regular school day and at such other times as may be necessaty to permit normal participation.
“.4.1.1 No special activity transportation shall be provided for spectators, guests, parents or other non-participants in the specific activity involved.”
The exhibits to Petz’ deposition also included administrative guideline 3.5.5.0.0-A about which Westfahl had testified. The administrative guideline’s provision for insurance coverage included the following language:
“.3.0 Field Trips, Curricular Activities, Extracurricular Activities (Continued)
“.3.2 Insurance Coverage
“.3.2.1 The District Fleet Policy covering bodily injury and personal injury protection extends coverage to students, employees and sponsors involved in authorized activity transportation. Drivers/ owners of private automobiles authorized for field trips and activity transportation are covered by the District Fleet Policy.
“.3.2.2 Students being transported to events sanctioned by the Kansas State High School Activities Association are eligible for catastrophic coverage.
“.3.3 Insurance Coverage—Non-District Owned Vehicles
“.3.3.1 The list of approved carriers shall include only contractors who meet or exceed district insurance mínimums and, in addition, name District #500 as ‘additional insured’ while transporting District #500 students, employees and non-employees.
“.3.3.2 Schools renting or leasing vehicles shall take ‘additional coverage.’
“.3.3.2.1 The additional package of collision, comprehensive, and liability coverage insurance reduces the schools’ responsibility for the deductible. Schools shall purchase the maximum coverage available for collision and comprehensive insurance.
“,3.3.2.2 The District is exempt as a governmental agency and is covered by medical insurance under the Fleet Policy, therefore, it is not necessary to secure Personal Injury Protection (P.I.Pf.j) as an additional coverage.
“.3.3.3 Private Auto
“,3.3.3.2 Verify that liability insurance coverage is in effect covering the owners and driver of the vehicle with state minimum liability requirements of $25,000.00 per individual, $50,000.00 per accident, and $10,000.00 property damage.”
The administrative guidelines also contained one passage specific to Sumner Academy of Arts and Science:
*140 “.4.5.1 In addition to transportation to and from school as outlined in Policy 3.5.5.2.1, special activity and service buses will be operated to serve all pupils who are involved in various extracurricular activities after the close of the school day. Special transportation schedules are made as follows:
“.4.5.1.1 One departure time from the school is to be approximately one (1) hour after the close of the regular- school day.
“.4.5.1.2 A second departure time is to be at approximately two and one-half (2-½) hours following the close of the school day.”
Petz was the administrator who differentiated between numbered district policies and numbered administrative guidehnes and explained the role of the administrative guidelines in an administrator’s decision-making process.
“[A]dministrators have—always have discretion in terms of. . . implementing or . . . administering their building based on . . . the individual circumstances that may or may not come up.
[[Image here]]
“You cannot totally tie the hands of an administrator and expect that they have to run their building by any one set of guidelines. There’s no way that you can write a set of guidelines that are going to apply to every situation that may or may not come up in a school building.
“If you’ve ever worked in a school building or if you’ve ever been an administrator in a school building, you would know that there are a myriad of different things that come up, and trying to have one set of guidelines that are going to apply to every particular instance that arises would be—you would have a book so voluminous that, you know, it wouldn’t fit in this room. And then something would happen, and you wouldn’t be able to find it in there anyway .... because there’s always a variety of tilings. So these are general administrative guidelines to assist them in their thought process. But in most cases, you know, they’re going to follow this process and adhere to—it’s more or less that these are to assist them in interpreting and administering board policy correctly.”
Petz testified that he was unaware of any district policy regarding reimbursement of costs for transportation of students other than special education students. However, be said that it was “not necessarily true” that other reimbursement for transportation would not be permitted. “[Djepending upon the circumstances of the event,” he said, “building principals could malee determinations that. . . other alternative forms of transportation are appropriate. . . . There’s not anything that particularly says in policy that they can do that. But policy does not preclude them from making that *141 judgment.” Petz said that the policy on reimbursement of costs for special education students’ transportation would not have applied to die activity transportation provided Rodriguez by Hitze. To his knowledge, there was “no written policy that specifically says that it’s allowed, but there’s not a specific policy that says it’s not allowed.”
Petz also was asked specifically about the transportation provided by the school for the soccer game on August 29, 2006, and whether the school had “authorized” Rodriguez to ride with Hitze. Petz said that the administrative guideline numbered 3.5.5.3.1.4-A, which required the presence of a “fully responsible adult[]” when students traveled by private vehicle, would apply only when the school arranged for private transportation to a school activity. He said that it did not apply to Rodriguez’ travel in Hitze’s pickup truck because “[t]he official mode of transportation that the district had arranged for [the soccer game] was by bus.” Students such as Rodriguez were not precluded from arranging other forms of transportation on their own, as long as the students’ parents had signed a permission form allowing those forms of transportation. “The schools permitted the parents to authorize outside travel,” he said. Petz said that the school district could not support someone riding in the back of a pickup truck, but Rodriguez was still under the “jurisdiction of the school” while he did so because he was going to the soccer match.
“Students have the prerogative to utilize private vehicles to transport themselves to school-sponsored activities. The school district in most cases will arrange school district transportation and have that available to them, but as I mentioned earlier, there are instances where students and families may choose to not avail themselves to that opportunity that they have. And—
[[Image here]]
“And that’s allowed. It’s not like if they don’t get on the school bus, when they get to the game, they don’t get to play. You know, so they are allowed to utilize their own transportation.”
Petz also testified that any reimbursement that had been requested would have come from the building activity fund and that it would be up to the principal whether to pay reimbursement.
*142 “To my knowledge, there’s not anything in policy that says you are to pay mileage to students or that you’re not to or you can’t. It’s left to die discretion of the building administrator as the manager of that budget as to what he or she determines are appropriate costs as to pay out of those funds.
[[Image here]]
“I testified that there’s nothing in policy that would prevent a principal from making a determination that mileage was a justifiable expense out of his or her activity fund. So there’s nothing that says they have to. There’s nothing that says they can’t. It’s basically a discretionary decision of the administrator as the budget manager of that fund.”
Petz testified that, in his opinion, any request for reimbursement that Hitze might file would be “subject to reimbursement” under the Mutual of Omaha insurance policy.
The school district’s attorney, Gregory Goheen, testified live at the bench trial. Goheen said that he had provided Mutual of Omaha with certain information about the school district’s policies and procedures relating to reimbursement of travel expenses, the statute he believed to provide the basis for travel reimbursement, and information on whether there were records of any student previously submitting a reimbursement request for expenses of driving to or from athletic events. According to Goheen, the school district could not find any record of a student filing a claim to be reimbursed for providing transportation for another student. He described a letter he sent to counsel for Mutual of Omaha that states it encloses a school district policy labeled 4.1.13.3.1. The enclosed policy included the following language:
“.3.1 Travel Mode and Rate
“Persons authorized to travel at Board expenses should adhere to administrative guidelines.
[[Image here]]
“.3.1.2 Travel by personal automobile will be reimbursed at the official mileage rate established by the State of Kansas when this mode of travel is approved by the Superintendent or appropriate assistant superintendent.
[[Image here]]
“.3.2 Expense Reimbursement
“Expenses approved for reimbursement are subject to administrative guidelines and the following limits:
*143 [[Image here]]
“.3.2.5 . . . mileage at the official mileage rate established by tire State of Kansas.”
Goheen also testified that Mutual of Omaha had asked him whether the school district would have paid a claim for mileage had a request for mileage reimbursement actually been made by Hitze. Goheen said he declined to answer Mutual of Omaha’s question because it was “a hypothetical and we hadn’t received the claim.”
At the conclusion of the bench trial, the district judge ruled that Rodriguez’ travel in Hitze’s truck was neither “authorized” by the school district nor “subject to reimbursement,” the two requirements for “covered travel” under the definition in the Mutual of Omaha policy. The judge based his decision on his belief that the school was prohibited by state law and district policies from authorizing travel by private vehicle when no adult was present. And, in his view, the travel would have qualified as subject to reimbursement only if the driver had a contract with the school district to pay for gasoline; there was no evidence that Hitze had such a contract. The district judge therefore held that Mutual of Omaha should be dismissed as a defendant in the case.
Rodriguez appealed to the Court of Appeals.
The Court of Appeals panel began its analysis of whether the accident occurred during “covered travel” by holding that there was no ambiguity in the insurance policy’s language requiring the travel to be “ ‘authorized’ ” and “ ‘subject to reimbursement.’ ” Rodriguez v. U.S.D. No. 500, 49 Kan. App. 2d 262, 265, 306 P.3d 327 (2013). It therefore “attribute[d] ordinary everyday meanings to the ordinary words used in this clause dealing with covered travel.” 49 Kan. App. 2d at 265.
The panel held that Sumner Academy’s system of parental permission forms
“created an informal method of transporting team members to soccer games by permitting teammates to ride with each other instead of riding on the school bus— tire ‘official’ mode of transportation. Employing permission slips from parents gave ample notice to all participants that the district would permit this form of travel. *144 We do not speculate why this was done because the record is unclear on that point. . . .
“These words and deeds compel us to conclude that the school permitted this transportation—this trip was not some impromptu act of two young men tiying to break the rules as an act of rebellion. This system of informal transportation of students was created and sanctioned by the school. In our view, this was authorized travel as contemplated by the insurance policy.” 49 Kan. App. 2d at 267.
The panel then turned to the question of whether the travel was “subject to reimbursement.” It held that travel could not qualify as subject to reimbursement if a claim could not actually be paid. Quoting from the administrative guideline discussed by Westfahl during the bench trial, which it mislabeled a district “policy,” the panel said that a person older than 21 must have been present and proof of insurance coverage must have been supplied to enable payment of any claim by Hitze. 49 Kan. App. 2d at 272-73. Thus, despite the panel’s disagreement wi A the Astrict judge on whether Sumner Academy authorized the travel, it held Aat Ae travel involved in this case did not qualify as subject to reimbursement, and thus there was no coverage under the Mutual of Omaha policy. 49 Kan. App. 2d at 275.
Rodriguez filed a petition for review to this court, asking us to reverse Ae panel’s holAng Aat the travel was not subject to reimbursement. He attached a document labeled “Plaintiff s EAibit D” but referred to as “AppenAx, Demonstrative EAibit 1,” apparently to illustrate Ae Afference between a school policy and a school administrative guideline. We note that this comparison document appears nowhere else in the record on appeal in this format and Aat Ae language in what is represented as Policy 3.5.5.3.2.1 is not included in the copy of the policy Aat was marked during Petz’ deposition. We Aerefore will not rely on Ais portion of the appendix. See Supreme Court Rule 8.03(h)(2) (2014 Kan. Ct. R. Annot. 77) (case heard on petition for review to be considered on basis of record previously filed with Court of Appeals); see also Supreme Court Rule 8.03(a)(4)(F) (2014 Kan. Ct. R. Annot. 78) (appendix to contain copy of Court of Appeals opinion, other “opinions, findings of fact, conclusions of law, orders, judgments, or decrees issued by Ae Astrict court or administrative agency, if *145 relevant to the issues presented for review”); cf. Supreme Court Rule 6.02(b) (2014 Kan. Ct. R. Annot. 40) (optional appendix to appellant’s brief to contain limited extracts from record on appeal; appendix not substitute for record itself); Supreme Court Rule 6.03(b) (2014 Kan. Ct. R. Annot. 47) (optional appendix to appel-lee’s brief subject to same restrictions as optional appendix to appellant’s brief).
Mutual of Omaha filed no cross-petition of the panel’s holding that the travel was authorized, but its counsel asserted at oral argument before this court that we are permitted to review that issue as well. See Supreme Court Rule 8.03(h)(1) (2014 Kan. Ct. R. Annot. 77) (permitting Supreme Court to revisit issue preserved and considered by Court of Appeals in civil case). We therefore address both aspects of the Mutual of Omaha policy’s definition of “covered travel” in our discussion below.
Discussion
Interpretation of an insurance policy raises “a question of law over which appellate courts have unlimited review.” Bussman v. Safeco Ins. Co. of America, 298 Kan. 700, 707, 317 P.3d 70 (2014). “ ‘As a general rule, tire construction and effect of a contract of insurance is a matter of law to be determined by the court. If the facts are admitted, tiren it is for tire court to decide whether they come within the terms of the policy.’ ” Harris v. Richards, 254 Kan. 549, 552, 867 P.2d 325 (1994) (quoting Farm Bureau Mut. Ins. Co. v. Horinek, 233 Kan. 175, Syl. ¶ 1, 660 P.2d 1374 [1983]). We assign language in an insurance policy the meaning a reasonably prudent insured would understand it to have. See Marshall v. Kansas Med. Mut. Ins. Co., 276 Kan. 97, 111, 73 P.3d 120 (2003).
On this appeal, no significant facts are in issue. The authenticity of the signature of Rodriguez’ father on the travel permission form is unchallenged. The circumstances of Rodriguez’ accident and injury are, for purposes of resolving the coverage controversy, undisputed. The fact that Hitze had never submitted a request for reimbursement to Sumner Academy or to the school district by the time of the bench trial is established beyond question. Likewise, the content of potentially controlling law and documents—the in *146 surance policy, statutes, district policies, or administrative guidelines—is set and merely awaits interpretation or construction.
We therefore face two pure questions of law subject to de novo review: Was Rodriguez’ travel authorized by Sumner Academy? And was the travel subject to reimbursement by Sumner Academy?

Authorization

We agree with the Court of Appeals panel that Sumner Academy’s system of obtaining parental consent and then allowing the type of travel at issue here leads inexorably to the legal conclusion that Rodriguez’ travel in Hitze’s pickup truck was “authorized” by the school, as that unambiguous word is commonly understood. See Webster’s Third New Int’l Dictionary 146 (1993) (“authorize” means “to endorse, empower, justify, or permit by or as if by some recognized or proper authority).
As the panel explained, the district judge misinterpreted and misapplied both a district administrative guideline, mischaracteri-zed by the panel as a “policy,” and Kansas statutes.
The district judge relied in part on administrative guideline 3.5.5.3.1.4-A, which requires the presence of an adult and verification of insurance if a private vehicle is used. Rut Petz emphasized more than once that this guideline, to the extent any guideline had binding effect, was not applicable to travel such as that at issue here. Rather, it applied only when the school arranged a specific mode of travel, such as the bus he believed to have been provided for the August 29, 2006, soccer match. Petz repeatedly made clear that Rodriguez’ travel with Hitze was not arranged or supervised by the school. It was not the official transportation subject to district requirements that an adult be present and insurance coverage verified. The bus was.
We also note that the administrative guideline falls under the subheading specific to “Field Trips and Curricular Activities,” not extracurricular activities such as soccer matches.
The statutes on which the district judge relied, K.S.A. 72-8305 and K.S.A. 72-8301(c), also were not actually helpful to his analysis of whether Rodriguez’ travel with Hitze was “authorized.”
*147 K.S.A. 72-8305 states that a board of education of any school district may provide and furnish transportation for students involved in extracurricular school activities:
“The board of education of any school district. . . which school district... is: . . . (c) engaged in any extracurricular school activity, may provide and furnish transportation for students .... The school district. .. may pay mileage for those school buses contracted, leased or hired for such purposes, and may adopt rules and regulations governing the use and operation of such school buses. All students so transported shall be under school control and discipline and in every case shall be accompanied by a suitable adult person.”
K.S.A. 72-8301(c) defines the phrase “ provide or furnish transportation’ ” to include a school district’s right to reimburse persons who provide transportation to students in private vehicles:
“The words ‘provide or furnish transportation’ in addition to their ordinary meaning shall mean and include the right of a school district to: (1) Purchase, operate and maintain school buses and other motor vehicles; (2) contract, lease or hire school buses and other motor vehicles for the transportation of pupils, students and school personnel; (3) purchase, operate and maintain buses other than school buses for the transportation of pupils, students or school personnel to or from school-related functions or activities; (4) contract, lease or hire buses other than school buses for the transportation of pupils, students and school personnel if the buses are owned and operated by a public common carrier of passengers under a certificate of convenience and necessity granted by the state corporation commission or the interstate commerce commission and are operating within the authority granted to the public common carrier; and (5) reimburse persons who furnish transportation to pupils, students or school personnel in privately owned motor vehicles.”
The district judge combined the multipart definition from K.S.A. 72-8301(c) with the plainly bus-specific language in the last sentence of K.S.A. 72-8305 to read in a requirement, similar to that in the administrative guideline above, for an adult presence. As the panel recognized, this was error, “too much of a stretch.” Rodriguez, 49 Kan. App. 2d at 269.
Petz’ deposition testimony, admitted at the bench trial, made clear that Rodriguez’ travel with Hitze, although not arranged for or supervised by Sumner Academy, was nevertheless authorized by it. Nothing in the administrative guideline 3.5.5.3.1-A or in K.S.A. 72-8305 or K.S.A. 72-8301(c) runs contrary to Sumner *148 Academy’s system of allowing such travel once parents agreed to it.

Subject to Reimbursement

Our agreement with the Court of Appeals panel ends with the authorization issue. Unlike die panel, we also conclude that Hitze’s expense in transporting Rodriguez to the soccer match qualified as “subject to reimbursement” under the Mutual of Omaha policy.
It was the responsibility of Mutual of Omaha, as it is with any insurance company, to draft the coverage language it deemed necessary to define and contain its risk. See Marshall, 276 Kan. at 112 (insurer assumes duty to define limitations to insured’s coverage clearly, explicitly). In this case, it did not restrict the definition of covered travel to that actually paid for or even likely to be paid for. Rather, it expressly included travel merely “subject to” being paid for. Netther party argues that “subject to reimbursement” is an ambiguous phrase, and we agree that it is not. Even if we did regard the phrase as ambiguous, we would be required to interpret it in the insured’s favor. Bussman v. Safeco Ins. Co. of America, 298 Kan. 700, 707, 317 P.3d 70 (2014). In our view, a reasonably prudent insured would understand the phrase to include travel that could be reimbursed and not limit its application to travel that was likely or would be or was required to be reimbursed.
State statutes do not compel a contrary conclusion. K.S.A. 72-8305 permits the board of education of a school district to provide and furnish transportation for extracurricular activities. As the Court of Appeals recognized, K.S.A. 72-8301(c) contemplates the possibility that a school district reimburse persons who provide transportation to students in private vehicles. And K.S.A. 72-8208a addresses the creation and disbursement, as well as the accounting necessary, for such funds:
“(a) The board of education of any school district may authorize, by separate resolutions, the establishment of school activity funds from which to make needed expenditures for the payment of expenses attributable to activities in which pupils of the district may participate directly or indirectly. Every such resolution shall specify tire general purpose for which the fund is 'to be established and shall authorize an employee of the school district to administer the fund.
*149 “(b) The employee authorized to administer any school activity fund established by any resolution provided for in this section shall keep a record of all receipts and expenditures from the fund, and shall, from time to time, and at the end of each school year, prepare a statement for the board of education showing all receipts, expenditures, and tire balance in the fund. The fund shall be kept separate from all other funds and be used only for authorized expenditures, and itemized receipts shall be taken for each expenditure.
“(c) All moneys received from the sale of admissions to activities which the school district sponsors shall be credited to school activity funds in accordance with policies and procedures adopted by tire board of education. Such moneys shall not be considered to be moneys of the school district for the purposes of K.S.A. 72-8202d, and amendments thereto.
“(d) The provisions of K.S.A. 12-105b, and amendments thereto, shall not apply to claims against any school activity fund established by any resolution provided for in this section.
“(e) As used in this section, the term ‘activities’ means activities, events, and competitions in such fields as athletics, music, forensics, and dramatics, and other interschool or intraschool extracurricular activities in which pupils may participate directly or indirectly.”
This statutory scheme appears to be consistent with Petz’ testimony, which indicated that a district principal would have discretion to choose whether to reimburse one student for transporting another student to a soccer match, tapping student activity funds for that purpose.
We also see nothing in the school policies or administrative guidelines that would prohibit reimbursement of Hitze if he had chosen to seek it. As already discussed, Petz fully reviewed the distinction between school policies and administrative guidelines. He also made clear that neither the policies nor tire guidelines prohibited reimbursement in the situation before us. We have carefully reviewed the language of all of the policies and administrative guidelines in the record on appeal and agree with his assessment. Most of the policies and guidelines contained are irrelevant to transportation for extracurricular activities. They instead govern daily travel to and from school, transportation of special education students, field trips, and curricular activities. They are silent about a prohibition of reimbursement in the situation before us. Any contrary interpretation by the parties, their counsel, the *150 district judge, or the Court of Appeals is simply incorrect, adding material and meaning to these provisions that does not exist. ■
As we close, we note that we need not go as far as we understood Rodriguez’ counsel to urge us to go at oral argument: We do not reach the further question of whether the school district could adopt a policy or administrative guideline more restrictive of reimbursement for student travel in private vehicles than the current statutory scheme allows. We also do not decide whether a school district could choose to ignore such a policy or guideline in a specific case. See Mallon v. City of Emporia, 11 Kan. App. 2d 494, 498, 726 P.2d 1354 (1986). These are interesting questions, but they are not before us. The fact is that, according to the parties’ evidence here, U.S.D. No. 500 had not adopted such a policy or guideline at the time Rodriguez was injured.
Conclusion
The travel during which Rodriguez was injured was “authorized” and “subject to reimbursement,” and thus there is coverage under the Mutual of Omaha policy language. The decision of the Court of Appeals is reversed. The judgment of dismissal of defendant Mutual of Omaha by the district judge is reversed, and the case is remanded to the district court for further proceedings.
Nuss, C.J., not participating.
Michael J. Malone, Senior Judge, assigned. 
***